UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**06 CRIM.     965**

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA             :

      - v. -                     :     SEALED INDICTMENT

BRIAN M. McLAUGHLIN,                 :     06 Cr.

           Defendant.            :

- - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____OCT 1 7 2006____
DATE FILED: _____
```

JUDGE KARAS

The Grand Jury charges:

### COUNT ONE
### (Racketeering)

At all times relevant to this Indictment, unless otherwise specified:

#### Local 3 And The J Division

1.     Local 3 ("Local 3" or the "Local") of the International Brotherhood of Electrical Workers (the "IBEW") was a local affiliate of the IBEW based in New York City.  Local 3 represented over 30,000 members, who were employed, for the most part, in various sectors of the electrical industry.  Local 3 was governed by an Executive Board and a group of officers.  Under the IBEW Constitution and the Local 3 Bylaws, the Business Manager of Local 3 was the principal officer of the Local and exercised primary authority in running many of the Local's day-to-day operations.  Among other powers, the Business Manager was authorized to appoint individuals to help operate the Local, some of whom were designated as Business Representatives.

2.    In accordance with its Bylaws, Local 3 was divided into various Units, which were often referred to as "divisions."  The different divisions within Local 3 handled different types of work within the Local's jurisdiction.  The Local 3 Bylaws also provided for the designation of Unit officers, who were responsible for conducting the affairs of the divisions.  Local 3 Business Representatives also helped to conduct and oversee the activities of particular Local 3 divisions.

3.    Union members within the J Division (the "J Division" or the "Division") of Local 3 performed work relating to the installation and maintenance of street lights and traffic signals throughout New York City.  The affairs of the J Division were overseen by a Local 3 Business Representative assigned to the Division, and by a group of officers who were appointed by the Business Representative to their official positions within the Unit.  Representatives of the J Division negotiated and administered collective bargaining agreements with employers; such agreements, which were executed by the Business Representative for the J Division and, in recent years, by the Business Manager of Local 3, governed the terms and conditions of employment for Local 3 members assigned to J Division jobs.

4.    Local 3 was a "labor organization," as that term is defined in Title 29, United States Code, Sections 142(3), 152(5),

and 402(i) and (j), and as that term is defined in New York State Labor Law Section 721:2.

5.   The companies that employed J Division members ("Street Lighting Contractors") entered into contracts with the City of New York (the "City") and other public authorities to perform work involving, among other things, the maintenance and installation of street lights and traffic signals on streets and roadways, including interstate highways, as well as in other public spaces, throughout the City.  The New York City Department of Transportation administered such contracts for the City.

### The New York City Central Labor Council

6.   The New York City Central Labor Council (the "CLC" or the "Council") was a chartered affiliate of the American Federation of Labor and Congress of Industrial Organizations (the "AFL-CIO") that provided support to numerous constituent labor organizations and union members.  The CLC functioned as the AFL-CIO's local office in New York City and received funds from its affiliated unions and associations.

7.   An Executive Board comprised of elected officers and board members was responsible for overseeing the Council's affairs.  Other elected officers conducted and supervised the CLC's day-to-day operations.  The President of the CLC served as its highest-ranking officer and had primary executive authority over its affairs.  The Secretary of the CLC oversaw many of the

organization's administrative functions.  Since at least in or about 1995, the CLC's President and Secretary received compensation as full-time employees of the Council.

### The New York State Assembly

8.    The New York State Assembly (the "State Assembly") was one of two houses of the New York State Legislature.  Since in or around 1938, members of the State Assembly were elected in even-numbered years for two-year terms.  The State Assembly convened for legislative sessions in Albany, New York.

### Brian M. McLaughlin

9.    BRIAN M. McLAUGHLIN, the defendant, held several official positions in several different entities.

a.    From in or about 1990 until in or about July of 2006, McLAUGHLIN served as the Local 3 Business Representative for the J Division.  In that capacity, McLAUGHLIN functioned as the highest ranking official of the J Division.  Among other responsibilities, he oversaw the internal operations of the Division; he represented the Division and its members in dealings with employers; he helped to negotiate and execute collective bargaining agreements; and he exercised substantial authority over the assignment of J Division members to employers, including the selection of certain union members to hold supervisory positions.

4

b.    Since in or about 1995, McLAUGHLIN served as the President of the CLC.  In that capacity, he was the CLC's highest ranking executive officer and exercised primary responsibility for overseeing many of the CLC's day-to-day operations.

c.    Since in or about 1993, McLAUGHLIN served as a New York State Assemblyman representing the 25th Assembly District, which included or extended into various sections of Queens, New York.  In order to carry out his responsibilities as an Assemblyman, McLAUGHLIN maintained an office located in Albany, New York (the "Albany Office"), as well as an office located in his Assembly District in Queens (the "District Office" or "D.O.").

d.    Since in or about 2002, McLAUGHLIN was a founding member and District Leader of the William Jefferson Clinton Democratic Club of Queens, Inc. ("the Clinton Club").  The Clinton Club was a political organization registered in New York State as a not-for-profit corporation.  It raised funds and held events to support candidates for public office, and to promote the objectives of the Democratic Party.  Prior to in or about 2002, when the Clinton Club was renamed, it was called the New Century Democratic Association.  The Clinton Club was operated out of McLAUGHLIN's legislative District Office, located in Queens, and members of McLAUGHLIN's State Assembly office staff

performed administrative and clerical work to assist McLAUGHLIN
and others in conducting Clinton Club activities.

### McLaughlin's Duties As A Union Official

10.   In his capacity as a Local 3 Business Representative
who was responsible for overseeing the affairs of the J Division,
McLAUGHLIN owed a duty to provide honest services to the members
of Local 3 and the J Division in the performance of his duties as
a union official.  That duty encompassed, but was not limited to,
various statutory obligations and requirements, including the
following:

a.   Title 29, United States Code, Section 501(a)
provided that officers, agents, and other representatives of a
labor organization occupied "positions of trust in relation to
such organization and its members as a group."  Accordingly,
pursuant to Section 501(a), McLAUGHLIN owed fiduciary duties to
Local 3 and its members, including: (1) the duty to hold union
money and property solely for the benefit of the Local and its
members; (2) the duty to refrain from dealing with the Local as
an adverse party or on behalf of an adverse party in any matter
connected to his duties; (3) the duty to refrain from holding or
acquiring any pecuniary or personal interest which conflicted
with the interests of Local 3 or its membership; and (4) the duty
to account to the Local and its members for any profit he
received in whatever capacity in connection with transactions

6

conducted by him or under his direction on behalf of the labor organization.

      b.   Title 29, United States Code, Section 432(a) provided that every officer of a labor organization, and every employee of such an organization who did not perform exclusively clerical or custodial services, was required to file a signed and publicly available report with the United States Secretary of Labor listing and describing, with certain limited exceptions, among other things: (1) any interest that he or a member of his family held, directly or indirectly, in an entity that employed individuals whom the labor organization represented or sought to represent; (2) any money or other thing of value that he or a member of his immediate family received, directly or indirectly, from such an employer; (3) any direct or indirect transaction or arrangement between him or a member of his immediate family and such an employer; and (4) any interest that he or a member of his immediate family directly or indirectly held in, as well as any income or any other benefit with monetary value which he or a member of his immediate family derived directly or indirectly from, any business a substantial part of which consisted of buying from, selling or leasing to, or otherwise dealing with, such an employer.

      c.   New York State Labor Law Section 722 set forth fiduciary obligations for officers and agents of labor

organizations and provided that such individuals could not, directly or indirectly: (1) have or acquire any pecuniary or personal interest which would conflict with his fiduciary obligation to such organization; (2) engage in any business or financial transaction which conflicted with his fiduciary obligations; or (3) act in any way which subordinated the interests of such labor organization to his own personal or pecuniary interests.

    e.   New York State Labor Law Section 723, titled "Specific prohibited financial interests and transactions," provided that without limiting the fiduciary obligations set forth in Section 722, an officer or agent of a labor organization would commit a violation of his fiduciary obligations if he were:

> to have, directly or indirectly, any financial interest in any business or transaction of either an employer whose employees his labor organization represented or sought to represent for purposes of collective bargaining, or an employer who was in the same industry as such an employer;

> to have, directly or indirectly, any financial interest in the business or transaction of any person who sold to, bought from, or otherwise dealt with an employer whose employees his labor organization represented or sought to represent for purposes of collective bargaining, or an employer who was in the same industry as such an employer; or

> to receive, directly or indirectly, any payments, loans, or gifts from an employer whose employees his labor organization represented or sought to represent for purposes of collective bargaining, or from an employer who was in the

> same industry as such an employer, except for
> anything received as reasonable compensation for
> services rendered as an employee of such an
> employer or certain payments made in lieu of wages
> for time spent in the administration of a
> collective bargaining agreement.

Section 723 further provided that in determining whether an officer or agent of a labor organization had engaged in conduct that constituted a violation of the fiduciary obligations set forth in Sections 722 and 723, it was not relevant whether or not such conduct (1) caused damage to the organization or any of its members, or (2) was ratified or acquiesced in by the organization.

## J Division Officers And Foremen

11.  During McLAUGHLIN's tenure as the Business Representative for the J Division, he selected other individuals to serve as officers of the Division.  Although these individuals performed official duties for the J Division, as provided for under the Local 3 Bylaws, they were not compensated by the Local or the Division.  Rather, with McLAUGHLIN's approval, they held supervisory positions, as either foremen or general foremen, for Street Lighting Contractors.  McLAUGHLIN also placed these individuals in various positions at other entities that he controlled, or in which he held office.  J Division officers and foremen who served under McLAUGHLIN, and whom McLAUGHLIN appointed to other positions in other entities, included the following individuals:

a.   <u>Officer 1</u>:  Since at least as early as 1995, an individual referred to in this Indictment as "Officer 1" served as the Chairman of the J Division.  In that capacity, Officer 1 functioned as the second-highest ranking officer of the Division, and he served as McLAUGHLIN's principal assistant.  From in or about 2000 until in or about May of 2006, Officer 1 was also the Treasurer of the Committee To Elect Brian McLaughlin, which, as alleged below, was an entity that received contributions and made expenditures to support McLAUGHLIN's campaigns to be reelected to the State Assembly.  From in or about March of 2005 until in or about February of 2006, Officer 1 also received a salary from the New York State Assembly for purportedly serving as the "Special Assistant to the Assemblyman" on McLAUGHLIN's legislative staff.

b.   <u>Officer 2</u>.  From at least as early as 1995 until in or about January of 2006, when he retired from active employment and union membership, an individual referred to in this Indictment as "Officer 2" served as the Treasurer and then as the Secretary of the J Division.  From in or about 1998 until in or about November of 2003, Officer 2 also received payments from the Committee To Elect Brian McLaughlin for purportedly serving as a "consultant" to McLAUGHLIN or his political campaigns.  Moreover, from in or about October of 2003 until in or about January of 2004, Officer 2 received a salary from the

New York State Assembly for purportedly serving as a "Community Liaison" for McLAUGHLIN's legislative District Office.

      c.   <u>Officer 3</u>.  From at least as early as 1995 until the present, an individual referred to in this Indictment as Officer 3 served as the Vice Chairman and then as the Treasurer of the J Division.  Moreover, at all times relevant to this Indictment, Officer 3 served as the President of the Electchester Athletic Association (the "EAA").  The EAA is an organization that was formed to finance and administer youth sports activities, including, primarily, a Little League baseball program, for children residing in the Electchester housing development, which is located in Queens.  Moreover, since in or about 2002, at McLAUGHLIN's direction, Officer 3 served as the Treasurer of the Clinton Club.

      d.   <u>Foreman 1</u>.  An individual referred to in this Indictment as Foreman 1 did not hold an official position for the J Division but worked as a foreman for Street Lighting Contractors.  Foreman 1 was a relative of McLAUGHLIN's.  He was also a licensed chiropractor who maintained an active practice based primarily on Long Island.  As alleged below, through entities that Foreman 1 formed to further McLAUGHLIN's purposes, Foreman 1 received payments from the CLC and the Committee To Elect Brian McLaughlin, purportedly for performing consulting or management services.  In addition, McLAUGHLIN arranged for

Foreman 1 to hold additional paid positions as a part-time member of McLAUGHLIN's legislative staff, and as the director of a CLC commission.  Finally, Foreman 1 was a part-owner of a business based in Manhattan that performed work relating to the processing of film used in the television and motion picture industries.

### The Racketeering Enterprise

12.  McLAUGHLIN, together with Officers 1, 2, and 3 and Foreman 1, along with other individuals known and unknown to the grand jury, constituted an enterprise (the "Enterprise") as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The Enterprise constituted an ongoing organization, members of which functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The Enterprise was engaged in and its activities affected interstate and foreign commerce.

13.  The objectives of individuals associated with the Enterprise included the following:

a.  using McLAUGHLIN's official positions, and the power and influence that McLAUGHLIN exercised by virtue of holding those positions, to enrich McLAUGHLIN and, to a lesser extent, others associated with the Enterprise, through criminal activity involving mail fraud, wire fraud, embezzlement, money laundering, the receipt of unlawful payments and other things of value from employers, and labor bribery;

b.    preserving and protecting their power, official positions, employment, and the proceeds obtained from the criminal activity described in paragraph 13.a above; and

c.    concealing their objectives and criminal activities in order to evade detection and possible prosecution.

<u>Means And Methods Of The Enterprise</u>

14.   The means and methods by which McLAUGHLIN and others known and unknown to the grand jury conducted and participated in the conduct of the affairs of the Enterprise and pursued the objectives set forth above included the following:

a.    They misappropriated funds from a J Division account that received contributions from union members and contractors, and that was maintained for the benefit of the J Division and its membership.

b.    They misappropriated funds from the Electchester Athletic Association by diverting contributions intended to support a Little League baseball program.

c.    They misappropriated funds from McLAUGHLIN's political campaign committee.

d.    They misappropriated funds from the CLC (1) by causing the CLC to hire a consultant and an employee who did little or no substantial work while funneling income from the CLC back to McLAUGHLIN, and (2) by causing the CLC to pay for McLAUGHLIN's personal expenses.

e.   They misappropriated funds from the State of New York (1) by creating fictitious positions on McLAUGHLIN's legislative staff, (2) by providing McLAUGHLIN with a share of the salary that a purported employee earned for holding one such position, and (3) by submitting false claims for reimbursement of daily expenses.

f.   They misappropriated funds from the Clinton Club.

g.   They received hundreds of thousands of dollars in unlawful payments and other things of value from Street Lighting Contractors and other companies in the street lighting and traffic signal industry.

h.   They secretly maintained an interest in, and received hundreds of thousands of dollars from, a company that did business with employers of Local 3 members, and they used their union positions to promote that company's, and thus their own, financial interests.

i.   They required J Division members to make monthly payments to McLAUGHLIN, through intermediaries, from proceeds that those workers obtained selling scrap metal and other salvaged materials recovered during the course of their jobs. Union members complied with McLAUGHLIN's directives to make these payments because they feared that if they failed or refused to do so, McLAUGHLIN would use his authority within the union to adversely affect their livelihoods.

j.   They moved funds between entities in which McLAUGHLIN held official positions, or over which McLAUGHLIN exercised control, to further and facilitate fraud and embezzlement schemes victimizing those entities.

k.   They engaged in money laundering and other measures to evade detection by concealing their actions and purposes and by disguising the sources of proceeds obtained from their illegal activities.

<u>The Racketeering Violation</u>

15.   From in or about 1995 through in or about 2006, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, and others known and unknown, being persons employed by and associated with the Enterprise described above, which was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, intentionally, and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of the racketeering acts set forth below.

<u>The Pattern Of Racketeering Activity</u>

16.   The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### RACKETEERING ACT ONE
### Mail Fraud And Embezzlement
### (The Street Lighting Association Account)

17.   The J Division raised and expended funds for the benefit of its members.  Such funds were deposited into a bank account held in the name of the "Street Lighting Association" (the "SLA"), which was controlled exclusively by J Division officers.  McLAUGHLIN and others regularly referred to the SLA account as the "J Division account."

18.   Funds from the SLA account were used (1) to finance social activities for J Division members, such as an annual dinner-dance and a summer picnic, (2) to provide cash prizes to union members who attended regular J Division meetings, and (3) for various other purposes to serve the interests of the J Division and its members.

19.   The J Division obtained contributions to the SLA account from two principal sources:

a.    Local 3 members assigned to the J Division made regular contributions to the Division in amounts specified by J Division officers.  Some union members made such payments directly to the SLA using personal funds; many others authorized employers to deduct contributions to the SLA from their paychecks.  Companies that deducted such contributions as part of a payroll process aggregated and then forwarded contributions directly to the J Division, by mail, on behalf of all

participating employees.  Contributions from J Division members accounted for most of the funds deposited into the SLA account.

b.   In addition, the J Division solicited and obtained contributions to the SLA from Street Lighting Contractors, and from other entities connected to McLAUGHLIN, such as the CLC and McLAUGHLIN's campaign fund.  Through letters signed by J Division officers, such contributors were asked to make donations to the SLA in order to support the J Division and its membership.  For example, on a yearly basis, Street Lighting Contractors were sent letters asking for contributions to support the Division's annual dinner-dance.  Other letters asked for contributions for particular causes or purposes.  For example, in at least one such instance, letters to Street Lighting Contractors sought contributions to support the purchase of gift certificates, which would be awarded to J Division members through a raffle in order "to offset the cost in the purchase of a turkey and trimmings for the family" during the holiday season.

20.  Since at least as early as 1997, bank records listed the address of the CLC's office as the address for the SLA account; consequently, bank statements, copies of cancelled checks, and other banking documents relating to the SLA account were mailed to the CLC, where McLAUGHLIN maintained an office. Since in or about 1997, Officer 3 – who, as stated above, was the Treasurer of the J Division – was the sole registered signatory

for the SLA account, and was therefore authorized to conduct transactions using that account.  Prior to in or about 1997, Officer 1 and Officer 2 were the authorized signatories for the SLA account.

21.   Although McLAUGHLIN was not an authorized signatory for the SLA account, he often maintained possession of the account checkbook, which he sometimes kept in his office at the CLC.  As a result, although Officer 3 was the only signatory for the SLA account, he regularly made written requests to McLAUGHLIN asking that checks be made available for particular purposes.  In addition, at McLAUGHLIN's direction, Officer 3 regularly signed SLA checks that were otherwise left blank; Officer 3 then provided such checks to McLAUGHLIN, so that McLAUGHLIN could fill in the remaining sections of the checks, indicating the amounts and the recipients as he saw fit.  In various instances, McLAUGHLIN also signed Officer 3's name to SLA checks.

22.   Since at least as early as 1995, McLAUGHLIN, often with the assistance of others, regularly and secretly misappropriated funds from the SLA for personal purposes, and not for the benefit of the J Division or its members.  Specific instances of conduct in which McLAUGHLIN and others engaged in order to further this scheme included the following:

Proceeds From SLA Checks Written To Officer 2

a.   Between in or about January of 1995 and in or about September of 2005, Officer 2 received and cashed more than 100 checks, worth hundreds of thousands of dollars, from the SLA account.  On some occasions, Officer 2 used proceeds from those checks to pay legitimate J Division expenses.  For example, during most years, Officer 2 used cash proceeds from SLA checks to pay catering companies that handled the J Division's annual dinner-dance and its summer picnic, and he occasionally used SLA funds to pay for less significant expenses incurred for the benefit of the Division.  In various other instances, however, on instructions from McALUGHLIN, Officer 2 provided proceeds from cashed SLA checks directly to McLAUGHLIN or to Officer 1, who acted as an intermediary for McLAUGHLIN; Officer 2 also, on other occasions, used or delivered funds from the SLA account as McLAUGHLIN directed, for matters unrelated to the J Division.  In this manner, over the years, Officer 2 provided McLAUGHLIN with at least $97,000 in cash payments derived from checks written on the SLA account.

SLA Checks Provided To Friend 1

b.   Between in or about May of 1997 and in or about October of 2003, McLAUGHLIN provided approximately 16 SLA checks, worth a total amount of approximately $21,900, to an individual with whom he maintained a personal relationship ("Friend 1").

Friend 1 had no legitimate reason to receive J Division funds. McLAUGHLIN, nonetheless, provided Friend 1 with SLA checks because of his relationship with her, in order to provide her with financial assistance.  Friend 1 used the proceeds from the SLA checks that McLAUGHLIN gave her for personal purposes.

<u>Specific Transactions That Occurred In 2004 And 2005</u>

c.   On or about January 6 and January 7, 2004, McLAUGHLIN caused a CLC check for $1,000 to be deposited into the SLA account, after he discovered that the account was overdrawn.

d.   On or about February 6, 2004, McLAUGHLIN made an SLA check out to himself in the amount of $9,750.  On the memo line of the check, he made a notation intended to create the impression that it was used to provide a caterer with a cash deposit.  In fact, however, McLAUGHLIN deposited the check into a personal bank account.  Several days later, McLAUGHLIN learned that news reporters were looking into allegations that he had committed criminal conduct, and he became alarmed.  During a conversation that occurred on or about February 11, 2004, in an attempt to conceal the fact that he had recently written an SLA check to himself, McLAUGHLIN suggested that Officer 2 should obtain an invoice for $9,750 from the caterer who had recently handled the J Division dinner-dance.

e.   In or about February of 2004, McLAUGHLIN then wrote a personal check for $9,750, made out to a catering

company, from the same personal account into which he had deposited the SLA check for that amount.  On the memo line, McLAUGHLIN indicated that the check was for the J Division dance. That check, however, was never provided to the catering company to which it was written.  Instead, it was provided to a J Division foreman ("Foreman 2") who knew of a location where a check could be cashed, regardless of to whom it was made payable. Foreman 2 cashed McLAUGHLIN's personal check for $9,750 and returned the proceeds either directly to McLAUGHLIN or to Officer 1, who normally acted as an intermediary for McLAUGHLIN in the course of such transactions.

   f.   On or about February 11, 2004, McLAUGHLIN directed Officer 2 to cash an SLA check for $1,900, and to provide the proceeds to an individual with whom McLAUGHLIN maintained a personal relationship ("Friend 2").  McLAUGHLIN further directed Officer 2 to make a notation on the check indicating that it was for a legitimate expense, such as the purchase of a television set or a raffle prize, that had been incurred in connection with the J Division dinner-dance.  Two days later, on or about February 13, 2004, Officer 2 cashed the SLA check for $1,900. When he was on his way to deliver the proceeds, however, as McLAUGHLIN had directed, McLAUGHLIN called Officer 2 and told him to bring the money directly to McLAUGHLIN, because he planned to meet Friend 3 a short time later.  Officer 2 complied with

McLAUGHLIN's instructions.  Friend 3 received this money and used it for personal purposes.

g.   On or about February 26, 2004, Officer 1, Officer 2, and Officer 3 had met privately at the building where Local 3 maintained its headquarters.  During their conversation, because of McLAUGHLIN's continuing concerns that his misconduct might be detected, Officer 1 instructed Officer 2 and Officer 3 to destroy the checkbook for the SLA account by immersing it in water, so that they could later claim that the checkbook was among materials damaged when the basement of McLAUGHLIN's District Office was flooded.  Officer 1 further instructed Officer 2 and Officer 3 to photograph the destroyed checkbook, using a camera that would not record the date.

h.   On or about June 3, 2004, McLAUGHLIN met with Officer 2.  During their conversation, as alleged below, McLAUGHLIN gave Officer 2 instructions to obtain additional contributions to the Electchester Athletic Association, so that McLAUGHLIN could use those funds for his personal purposes.  Then – after telling Officer 2 "no phone conversations," "nothing on the fucking phone ever again" – McLAUGHLIN stated that when money came in for the J Division summer picnic, "I gotta do a good fucking chunk of that.  That's what I fucking need."

i.   On or about June 24, 2004, McLAUGHLIN told Officer 2 that when contributions arrived for the J Division picnic, he

wanted Officer 2 to use those funds to purchase six money orders, which should be made out to a property management company (the "Albany Property Company") to which McLAUGHLIN made rental payments for an apartment he maintained in the Albany area. Those payments, McLAUGHLIN explained, would take care of the rent that he would owe for the rest of the year. McLAUGHLIN further instructed Officer 2 to inform Officer 3 to provide Officer 2 with the funds that would be necessary to handle this transaction.

       j.    On or about July 12, 2004, McLAUGHLIN met with Officer 2 and informed him that because contributions were coming in for the J Division picnic, funds were available in the SLA account. McLAUGHLIN directed Officer 2 to cash two checks for $6,000, several days apart, and he indicated that the money should be given to one of his relatives (the "Relative"), so that she could pay McLAUGHLIN's credit card bill.

       k.    On or about July 15, 2004, McLAUGHLIN met with Officer 2 and directed him to cash an SLA check in the amount of $9,000. McLAUGHLIN further stated that Officer 2 should return the cash to McLAUGHLIN, so that he could give it to the Relative. On or about the same date, as instructed, Officer 2 cashed an SLA check in the amount of $9,000. About two days later, Officer 2 met with McLAUGHLIN and provided him with $9,000 in cash. From those funds, McLAUGHLIN provided the Relative with $8,000. The

Relative then deposited that money into her bank account and made an $8,000 payment to McLAUGHLIN's American Express account.

l.    Between on or about February 9 and on or about February 12, 2005, on three different dates, Officer 2 cashed an SLA check for $7,000 and provided the proceeds to Officer 1. Because the catering company that was expected to provide services at the J Division dinner-dance in February of 2005 cancelled its commitment shortly before the event, Officer 1, who was an accomplished amateur chef, agreed to handle the catering himself.  Of the $21,000 in cash that Officer 1 received from Officer 2, he used approximately $9,000 to reimburse himself for expenses he incurred by catering the J Division dinner-dance.  On instructions from McLAUGHLIN, Officer 1 kept the remainder of the money and then used it to pay for construction and renovation work that had been done at McLAUGHLIN's new home.

m.    On or about October 18, 2005, Officer 2 met with McLAUGHLIN and the Chief Of Staff of McLAUGHLIN's State Assembly office (the "Chief Of Staff").  During the conversation, McLAUGHLIN described a plan to use $2,000 from the SLA account to compensate J Division members who would make $250 contributions, in the names of their wives, to the political campaigns of two candidates who were running for election to the New York City Council.  In or about late October of 2005, the Chief Of Staff had conversations with Officer 2 and Officer 3, during which she

24

asked them to collect checks from the J Division "contributors" whom McLAUGHLIN had identified, and to reimburse them using funds from the SLA account.  Officer 2 and Officer 3 complied with those instructions.  As a result of this conduct, the two city council campaigns received checks in the names of, among others, Officer 2's wife, a J Division foreman, and McLAUGHLIN's Chief Of Staff.  On or about October 25, 2005, Officer 3 cashed an SLA check for $2,000.  He then distributed the proceeds to compensate the individuals who had made the sham campaign contributions.

### Additional Expenditures Of J Division Funds

n.    Between in or about July of 1995 and in or about July of 1996, McLAUGHLIN caused four SLA checks, in a total amount of more than $4,100, to be issued to a marina and boat service center, and to a home improvement supply store, that were located in the vicinity of Tuckerton, New Jersey, where McLAUGHLIN, at the time, kept a boat.

o.    In or about November of 1998, McLAUGHLIN caused an SLA check in the amount of approximately $2,400 to be issued an automobile financing company in order to make a payment for his personal car.

p.    In or about September of 2000, McLAUGHLIN caused an SLA check in the amount of $1,000 to be issued to an individual with whom, at the time, he maintained a personal relationship ("Friend 3").  Friend 3 had no legitimate reason to

receive J Division funds.  McLAUGHLIN, nonetheless, provided Friend 3 with this SLA check because of his relationship with her.

q.   In or about March of 2003, McLAUGHLIN caused an SLA check in the amount of approximately $4,200 to be issued to a country club in Long Island in order to pay his membership dues.

### Mail Fraud And Embezzlement

23.  The defendant committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act One:

### A. Mail Fraud

a.   From in or about January of 1995 through in or about December of 2005, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud the J Division, its membership, and individuals and entities making contributions to the Street Lighting Association, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused mail matter to be delivered by the United States Postal Service according to the direction thereon, for the purpose of executing such scheme and artifice, to wit, the mailing of letters seeking donations to the J Division of Local 3 in the form of checks written to the SLA,

the mailing of such donations from Street Lighting Contractors, the mailing of contributions deducted from the paychecks of J Division members, and the mailing of checks and money orders obtained using funds from the SLA account, in violation of Title 18, United States Code, Sections 1341 and 2.

### B. Embezzlement Of Union Funds

b.   From in or about January of 1995 through in or about December of 2005, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, while being employed, directly and indirectly, by Local 3, which was a labor organization engaged in an industry affecting commerce, McLAUGHLIN did embezzle, steal, and unlawfully and willfully abstract and convert to his own use, and the use of others, the moneys, funds, property, and assets of such organization, to wit, funds held in the Street Lighting Association account for the benefit of the J Division and its members, in violation of Title 29, United States Code, Section 501(c) and Title 18, United States Code, Section 2.

### RACKETEERING ACT TWO
### Mail Fraud
### (The Electchester Athletic Association)

24.   In or about the late 1940s, officials of Local 3, along with leaders of a labor-management association called the Joint Industry Board of the Electrical Industry, commenced an initiative to finance and build a housing development.  Their

purpose was to provide members of Local 3 and other New York City residents with an affordable place to live, in a community that would support the needs of workers and their families.   Funding for the project was obtained from various sources, including Local 3's pension fund and union members who planned to reside in the development.   Construction of the project began in or about 1950, and the development was named Electchester.   Electchester ultimately contained more than thirty large apartment buildings in the Pomonok section of Queens.   Many members of Local 3 lived in the Electchester houses over the years.

25.   The Electchester Athletic Association, Inc. (the "EAA") was formed as a not-for-profit corporation in or about 1956, and it has continued to operate since that time.   The EAA's purpose was to finance and operate youth sports programs for children who lived in the Electchester area.   In recent years, the EAA focused primarily on running a Little League baseball program.

26.   Since at least as early as 1988, Officer 3 served as the President of the EAA.   At various times over the past twenty years, Officer 1 and Officer 2 also held official positions for the EAA.

27.   The EAA obtained money to support its programs in several ways, including the following:

a.    Families of children who took part in EAA sports programs paid fees in order to participate, and the EAA held events to raise funds in the Electchester community.

b.    Members of the State Assembly regularly directed the allocation of State funds to certain groups or projects. Typically, the Office of the Speaker of the Assembly provided Assembly members with information regarding the amount of funds that were available for such disbursements.   Members then made recommendations regarding the manner in which available funds should be allocated.   Such recommendations were directed to the Ways and Means Committee of the State Assembly, which then reviewed the Members' proposals.   Expenditures made as a result of such recommendations were often referred to as "member items." The funding for member items, after being approved through the necessary legislative channels, was often delivered in the form of grants issued by state agencies.   In this manner, McLAUGHLIN used his position as a State Assemblyman to direct the allocation of state funds to the EAA.   As a result, the EAA obtained grants from New York State agencies that provided assistance to children and families.

c.    On an annual basis, at McLAUGHLIN's direction, Officer 2 and Officer 3 prepared and mailed letters to various individuals and entities in order to solicit contributions to help finance the EAA's Little League program.   Sponsorship forms

that were enclosed with such letters instructed that checks should be made out to the EAA and sent to McLAUGHLIN's attention at the address where the J Division maintained its office.   The sponsorship forms thanked the contributor and concluded with the message: "A CHILD IN SPORTS STAYS OUT OF THE COURTS!"   Recipients of such letters included: (1) Street Lighting Contractors and other businesses in the electrical industry; (2) entities affiliated with Local 3; (3) McLAUGHLIN's campaign committee; (4) the CLC; (5) the Clinton Club; (6) various clubs and other associations affiliated with labor unions, community groups, or political organizations; (7) businesses that provided goods or services to entities in which McLAUGHLIN held official positions; (8) individuals who held public office; and (9) housing companies that owned and operated the residential buildings within the Electchester development.

28.   Between at least in or about 1995 and the present, the EAA maintained two accounts at one bank (collectively, the "EAA Bank-1 Accounts"), and it maintained a separate account at a different bank (the "EAA Bank-2 Account").   Officer 1 and Officer 3 were authorized to conduct transactions using the EAA Bank-1 Accounts; Officer 1, Officer 2, and Officer 3 were authorized to conduct transactions using the EAA Bank-2 Account until in or about 2005, when Officer 1's name was removed as an authorized signatory for that account.

29.  Fees received from the families of children who
participated in EAA sports programs, proceeds from fund raising
events, and funds received from New York State agencies were
deposited into the EAA Bank-1 Accounts.  At McLAUGHLIN's
direction, however, Officer 2 and Officer 3 diverted many
sponsorship payments, and contributions made in response to
solicitation letters, to be deposited into the EAA Bank-2
Account.  With at least one exception – when, as described below,
McLAUGHLIN misappropriated $2,000 from the EAA Bank-1 Accounts –
Officer 3 used funds from the EAA Bank-1 Accounts to pay for the
legitimate activities of the EAA.  In contrast, at McLAUGHLIN's
direction, Officer 2 withdrew nearly all the funds deposited into
the EAA Bank-2 Account, through checks that Officer 2 wrote to
himself and cashed, and then provided that money to McLAUGHLIN or
used it as McLAUGHLIN instructed.  As a result, funds that were
diverted into the EAA Bank-2 Account were not used for the
benefit of either the EAA or the children who participated in EAA
sports programs.

30.  In this manner, since in or about 1997, McLAUGHLIN,
with assistance from others, defrauded the EAA and its
contributors of more than $95,000.  Of that amount, more than
$9,500 consisted of contributions to the EAA from Street Lighting
Contractors, which had been diverted into the EAA Bank-2 Account.
Other diverted and misappropriated funds were contributed to the

EAA from, among other entities: (1) McLAUGHLIN's Campaign Committee; (2) the CLC; (3) a division of Local 3; (4) Electchester housing companies; (4) various clubs and associations; and (5) the New Century Democratic Association, which, as alleged above, later became the Clinton Club.

31.   Specific instances of conduct in which McLAUGHLIN and others engaged to further this scheme included the following:

a.   On or about February 7, 2004, McLAUGHLIN instructed Officer 2 to meet with Officer 3, so that they could attend to the mailing of letters seeking contributions to the EAA.

b.   On or about April 23, 2004, during a meeting between McLAUGHLIN and Officer 2, McLAUGHLIN stated that they needed to increase the amount of funds in the EAA Bank-2 Account. McLAUGHLIN instructed Officer 2 to intercept the incoming contributions, so that Officer 2 would have them all.  McLAUGHLIN further instructed Officer 2 to speak with Officer 3 to find out how many checks Officer 3 had deposited.  In carrying out these instructions, McLAUGHLIN cautioned, Officer 2 should not use the telephone, but should instead speak to Officer 3 in person.

c.   On or about June 3, 2004, McLAUGHLIN met with Officer 2.  During the conversation, McLAUGHLIN indicated that he needed at least $6,000, and that he wanted to pay the rent for his apartment in Albany for the rest of the year.  Officer 2

indicated that he had $3,500 in the EAA Bank-2 Account, but that Officer 3 had taken $2,800 for softball and other expenses and was not willing to part with the remaining funds. In response, McLAUGHLIN instructed Officer 2 to tell Officer 3 that "all that fucking money, he's fucking spending on other stuff, that ain't his money . . . that's mine." McLAUGHLIN also instructed Officer 2 to raise additional funds by obtaining contributions from the CLC and Street Lighting Contractors, and by collecting an additional $2,000 from Officer 3. Once they had $7,500 available, McLAUGHLIN stated, they would obtain money orders to pay for some things. In completing these tasks, McLAUGHLIN again instructed, Officer 2 should not speak on the telephone.

d. McLAUGHLIN met with Officer 2 on or about June 7, 2004. During their conversation, McLAUGHLIN again instructed Officer 2 to obtain $2,000 from Officer 3, and to contact various contractors and other entities to raise additional funds for the EAA. McLAUGHLIN also stated that later that day, he would try to provide Officer 2 with a check from the CLC for $750. Continuing, McLAUGHLIN gave Officer 2 instructions regarding the manner in which the available EAA funds should be used. In accordance with those instructions, Officer 2 cashed a check drawn on the EAA Bank-2 Account, and thereby withdrew nearly all of the funds in that account. Using those funds, Officer 2 (1) made a cash deposit into McLAUGHLIN's personal checking account,

(2) purchased three money orders, which Officer 2 later provided to McLAUGHLIN, and (3) delivered the remaining cash to McLAUGHLIN's wife.

e.   On or about June 17, 2004, on instructions from McLAUGHLIN, Officer 2 contacted Officer 3 and indicated that McLAUGHLIN wanted $2,000.  Officer 3 initially indicated that he would have to pay his expenses first, but Officer 2 explained that McLAUGHLIN was expecting the money that day or the following day.  Officer 3 stated that he would write a check to Officer 2, not to himself, because his records relating to the EAA Bank-1 Accounts could be audited by New York State.  Later that day, Officer 3 provided Officer 2 with a check for $2,000 written on one of the EAA Bank-1 Accounts.

f.   On or about June 24, 2004, McLAUGHLIN met with Officer 2.  During the meeting, Officer 2 provided McLAUGHLIN with the $2,000 in cash that Officer 2 had obtained from cashing the check described in the previous paragraph.  McLAUGHLIN stated that when Officer 2 obtained a contribution check from the CLC, he should deposit it directly into McLAUGHLIN's checking account. Officer 2 pointed out that this could not be done, because the check would be made out to the EAA.  McLAUGHLIN instructed Officer 2 to cash the check first.  McLAUGHLIN further stated that he would be at the CLC the following morning, and that he

would arrange for the check to be left there for Officer 2 to pick up.

g.  In or about July of 2004, McLAUGHLIN instructed Officer 2 to use the available funds in the EAA Bank-2 Account, along with J Division funds from the SLA account, to purchase money orders in order to pay McLAUGHLIN's rent in Albany. Officer 2 complied with McLAUGHLIN's instructions.

h.  On or about March 7, 2005, Officer 2 provided McLAUGHLIN with approximately $6,800 in cash proceeds from the EAA Bank-2 Account.

i.  On or about March 28, 2005, Officer 2 provided McLAUGHLIN with approximately $1,200 in cash proceeds from the EAA Bank-2 Account.

j.  On or about April 18, 2005, Officer 2 provided McLAUGHLIN with approximately $1,300 in cash proceeds from the EAA Bank-2 Account.

## Mail Fraud

32.  From at least in or about 1997 through in or about 2006, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud the EAA and its contributors, and to obtain money and property by means of false and fraudulent pretenses, representations and promises,

35

caused mail matter to be delivered by the United States Postal Service according to the direction thereon, for the purpose of executing such scheme and artifice, to wit, the mailing of letters seeking donations to the EAA, as well as the mailing of such donations intended for the benefit of the EAA, in violation of Title 18, United States Code, Sections 1341 and 2.

### RACKETEERING ACTS THREE through FIVE
### Mail Fraud, Wire Fraud, And Money Laundering
### (The Committee To Elect Brian McLaughlin)

33.   McLAUGHLIN financed his campaigns for election to public office through one or more campaign funds.   Since in or about 1997, a fund called the Committee To Elect Brian McLaughlin (the "Campaign Committee") was a campaign fund registered with the New York State Board of Elections (the "BOE") that received contributions and made expenditures to finance McLAUGHLIN's campaigns to be reelected to the New York State Assembly.

34.   Under state law, campaign committees were required to designate a Treasurer and a Depository of campaign funds, using a form that was filed with the BOE.   As alleged above, between in or about 2000 and in or about May of 2006, Officer 1 served as the Treasurer of McLAUGHLIN's Campaign Committee.   Prior to that time, an individual who worked as a secretary for McLaUGHLIN at the CLC served as the Treasurer for the Campaign Committee.

35.   The Campaign Committee maintained a checking account that was used to deposit and expend funds contributed to

McLAUGHLIN's political campaigns.  Between in or about 2000 and
in or about 2006, as the Campaign Committee's Treasurer, Officer
1 was the individual authorized to sign checks written on this
account.  Moreover, state law required that Officer 1, as the
Treasurer, maintain detailed financial records relating to the
Campaign Committee's receipts, disbursements, and other
transactions.

　　　36.  Under state law, the Campaign Committee was required to
file financial disclosure statements with the BOE that contained
information regarding, among other things, contributions that the
Committee received and expenditures that the Committee made
during specified reporting periods.  The Campaign Committee was
required to submit two periodic financial disclosure reports
every year, in January and July.  Moreover, during election
years, the Campaign Committee was required to file three
additional reports for each primary, general, or special
election, which were due at specified intervals preceding and
following the dates on which such elections were held.  In
disclosing information regarding its expenditures, the Campaign
Committee was required to include, for each disbursement of at
least $50, information that included (1) the date and amount of
the payment, (2) the identity of the recipient, and (3) the
purpose for which the payment was made.  As the Treasurer of
McLAUGHLIN's Campaign Committee, Officer 1 was responsible for

completing and filing these financial disclosure statements. In doing so, Officer 1, as required under state law, executed verifications indicating, under penalty of legal sanction, that the information contained in the reports was "in all respects, true and complete to the best of the filer's knowledge, information, and belief." In accordance with BOE regulations, Officer 1 submitted the Campaign Committee's financial disclosure statements electronically, using an e-mail account that he maintained with an internet service provider ("ISP"). Because that ISP maintained its servers outside of New York State, electronic signals crossed state lines whenever Officer 1 transmitted e-mail messages. In addition, Officer 1 saved the Campaign Committee's financial disclosure statements on computer diskettes, which he then sent by mail to the BOE. Since in or about 1999, the BOE has made the financial disclosure statements filed by political campaign committees available on the internet, so that the information contained in those reports would be available to the public.

37. McLAUGHLIN solicited campaign contributions through, among other means, regular mailings sent to numerous contributors and potential contributors located throughout the New York City area and in other locations. Such mailings requested donations to support McLAUGHLIN's campaigns for the State Assembly, and they contained information regarding his accomplishments and

objectives while in office.  The mailings did not indicate or suggest in any way that McLAUGHLIN used funds from his Campaign Committee to pay for personal expenses.  Substantial contributors to the Campaign Committee included Street Lighting Contractors, individuals and entities affiliated with such contractors, other companies in the electrical industry, and entities that did business with one or more organizations in which McLAUGHLIN held official positions.

38.  New York State election law provided that campaign contributions received by a candidate or a political committee could not be converted by any person to a personal use that was unrelated to a political campaign or the holding of public office or party position.

39.  As alleged more specifically below, in numerous instances and on a regular basis, McLAUGHLIN misappropriated funds from his Campaign Committee, used those funds for personal purposes, and, with assistance from Officer 1 and others, caused false and misleading financial disclosure statements to be filed with the BOE in order to conceal this criminal conduct and create the appearance that Campaign Committee funds had been spent for legitimate purposes.

A.    Payments To The Management Company That Were Used
      To Finance Construction At McLaughlin's New Home

40.   McLAUGHLIN stood for and won reelection to the New York State Assembly in 2004.  He had no opponent in the primary or general elections conducted that year.

41.   In or about the summer of 2004, at McLAUGHLIN's direction, the Campaign Committee retained a company (the "Management Company") for the purported purpose of performing consulting and/or management services for McLAUGHLIN's 2004 reelection campaign.  Foreman 1 owned and operated the Management Company, which, as alleged below, he had formed in or about late 2002, at McLAUGHLIN's behest, in order to receive payments from the CLC, portions of which he then provided to McLAUGHLIN.  At the time that the Campaign Committee retained the Management Company, Foreman 1 – who, as stated above, was a practicing chiropractor and also held a full-time job for a Street Lighting Contractor – had worked as a volunteer on McLAUGHLIN's prior campaigns. Foreman 1, however, had no professional experience as a consultant or manager for political campaigns, and the Management Company did not perform such services for any other clients.

42.   In fact, the Campaign Committee did not retain the Management Company to obtain political consulting or management services from Foreman 1.  Rather, the Management Company was retained for the primary purpose of carrying out a scheme through

40