which McLAUGHLIN could use Campaign Committee funds for his personal benefit, while concealing that objective and creating the appearance that the funds were being used to finance his reelection campaign.

43.   Between in or about September of 2004 and in or about February of 2005, the Campaign Committee issued a series of checks to the Management Company, in a total amount of more than $146,000.  Those payments were described, in the Campaign Committee's financial disclosure statements submitted to the BOE, as expenditures for consulting services relating to McLAUGHLIN's 2004 campaign.  Foreman 1 used some of the funds that the Management Company obtained from the Campaign Committee to pay for ordinary and legitimate campaign-related expenses, such as the purchase of advertising and campaign literature.  Most of the proceeds from the Campaign Committee's payments to the Management Company, however, were ultimately expended for McLAUGHLIN's benefit, using several different mechanisms.  For example, Foreman 1 provided Officer 1 with cash payments totaling more than $34,000, which Foreman 1 obtained from cashing checks drawn on the Management Company's account.  Foreman 1 also used the bank account of a different corporate entity that he controlled to provide Officer 1 with a series of checks and cash payments worth a total amount of more than $70,000.  At McLAUGHLIN's direction, Officer 1 then used the funds that he received from

41

Foreman 1, along with proceeds from other racketeering activity alleged in this Indictment, to make a series of cash payments to an individual who oversaw construction and renovation work (the "Construction Manager"), and who paid subcontractors hired to perform that work, at a home that McLAUGHLIN purchased in or about April of 2003 in the vicinity of Nissequogue, Long Island (the "Nissequogue Residence"). In addition, using one of the corporate accounts from which Foreman 1 provided Officer 1 with checks and cash payments, Foreman 1 wrote a check made out to McLAUGHLIN's wife in an amount of more than $10,000, and he wrote a check for more than $4,000 directly to a subcontracting company that performed work at the Nisequogue Residence. Finally, Foreman 1 used a credit card to purchase materials used in the renovation project; he then paid for those charges, which totaled thousands of dollars, using checks drawn on an account held in the name of one of Foreman 1's chiropractic offices.

44. Specific instances of conduct in which McLAUGHLIN and others engaged, along with those described above, to further this scheme included the following:

    a.   On or about March 8, 2005, Officer 1 met with the Construction Manager at McLAUGHLIN's Nissequogue Residence. During that meeting, Officer 1 paid the Construction Manager over $7,700 in cash, and they discussed the status of renovations that

had been done, as well as work that remained to be completed, at the property.

      b.  On or about March 11, 2005, Officer 1 and Foreman 1 met at the offices of the Street Lighting Contractor where they were both employed.  During the meeting, Foreman 1 provided Officer 1 with $2,000 in cash.  A short time later, Foreman 1 told Officer 1 that this payment was the balance of proceeds from a check that the Campaign Committee had issued to the Management Company.  Foreman 1 further indicated that, at the time, he had spent and returned about $10,000 more than he had received through the Campaign Committee's payments to the Management Company.

      c.  On or about March 25, 2005, McLAUGHLIN met with Officer 1.  During their conversation, Officer 1 stated that the Campaign Committee's most recent check to the Management Company had been for an amount of more than $25,000.  After McLAUGHLIN acknowledged that fact, Officer 1 stated that Foreman 1 had recently given back "$7,000 in twenties," followed by "another $2,000 in twenties."  Later in the conversation, Officer 1 suggested that they should meet with Foreman 1 to discuss the status of their financial dealings.  McLAUGHLIN agreed and indicated that the meeting should be handled quietly.

      d.  On or about March 19, 2005, McLAUGHLIN met with Foreman 1 and Officer 1.  During their conversation, after

addressing issues relating to a different scheme, they discussed
various payments that the Management Company had received from
the Campaign Committee, and money that Officer 1 had received
back from Foreman 1, which was then used to pay for renovations
at the Nissequogue Residence.  In the context of that discussion,
Foreman 1 again mentioned that he was running "ten thousand
negative."  He added, however, that this deficit was "not a big
deal" because of income that he expected to receive from work
relating to the CLC.

     e.   On or about March 25, 2005, McLAUGHLIN met with
Officer 1.  During the conversation, Officer 1 stated: "Like,
from the Committee, I write [Foreman 1] all these checks.  When I
ask for cash to pay [the Construction Manager], he gives me the
cash, and then I pay [the Construction Manager]."  Officer 1 then
asked whether McLAUGHLIN knew how much money Foreman 1 was
spending, and how much was left over.  In response, McLAUGHLIN
indicated that he did not know, and he further stated that his
"bigger problem" related to tax and accounting issues arising
from a different series of payments that Foreman 1 was making.
In continuing this discussion, McLAUGHLIN explained a plan he had
formulated to receive half the proceeds that Foreman 1 would earn
through a fund raising project for the CLC.  Later in the
conversation, McLAUGHLIN described Foreman 1 as "like a conduit
for us."

      f.    On or about April 1, 2005, McLAUGHLIN met with Officer 1 and Foreman 1.  During their conversation, McLAUGHLIN stated that he wanted to formulate a "reasonable budget," and he asked Foreman 1 to bring him up to date regarding the amounts of money that the Management Company had received and had used to pay "real expenses."  Foreman 1 agreed to do so.  He then reviewed various payments that the Management Committee had received from the Campaign Committee, and sums that had been returned, in various ways, to provide McLAUGHLIN with money that he needed and to pay the Construction Manager.  Foreman 1 also stated that at the time of the meeting, he was owed $10,000.  In response, Officer 1 asked McLAUGHLIN how he wanted to pay Foreman 1 that amount.  Foreman 1 then stated: "Oh, we have that because I'm gonna be billing the [Central Labor] Council . . . . So, I mean that, we'll be back to a few dollars of working capital when that's all said and done."  Foreman 1, McLAUGHLIN, and Officer 1 then discussed the payments that the Management Company had received from the Campaign Committee, and they added up campaign-related expenses that Foreman 1 had paid with those funds.  Summarizing these calculations, Officer 1 commented that from the payments that the Campaign Committee had made to the Management Company, more than $80,000 "came back to Brian for the house."  McLAUGHLIN then indicated that their plan had been a good one.

B.   Payments To Officer 2

45.   Between in or about November of 1998 and in or about July of 2003, more than forty checks, worth a total amount of approximately $55,500, were written from the Campaign Committee to Officer 2.  The Campaign Committee's financial disclosure statements described these payments as being made for the purpose of obtaining consulting services.  In fact, Officer 2 did no work as a consultant for McLAUGHLIN's campaign, or for McLAUGHLIN's legislative office, or for any other individual or entity. Instead, these checks were provided to Officer 2 to implement another scheme through which McLAUGHLIN obtained Campaign Committee funds for his personal use, while concealing that objective and creating the appearance that the funds were being used for legitimate purposes.  Accordingly, at McLAUGHLIN's direction, Officer 2 cashed the checks that he received from the Campaign Committee and provided the proceeds to McLAUGHLIN or used the proceeds in accordance with McLAUGHLIN's instructions.

46.   Many of the Campaign Committee's checks to Officer 2 were issued on a monthly basis, in an amount of approximately $500.  When Officer 1 discovered that Officer 2 was incurring personal expenses to purchase money orders, or to engage in other transactions, in carrying out McLAUGHLIN's instructions, Officer 1 increased the Campaign Committee's monthly payments to Officer 2 by a small amount in order to cover Officer 2's costs.

C.     Payments For Cleaning Services
       Performed At McLaughlin's Residence

47.   Between in or about March of 1998 and in or about July
of 2003, more than fifty checks, worth a total amount of
approximately $29,000, were written from the Campaign Committee
to an individual who performed cleaning services (the "Cleaning
Person").  The Cleaning Person typically received $450 per month,
or $900 every other month, from the Campaign Committee.  Of that
amount, $400 compensated the Cleaning Person for cleaning
McLAUGHLIN's residence, where she worked one day a week, for most
of the day.  The remaining $50 compensated the Cleaning Person
for cleaning McLAUGHLIN's District Office, where she worked for
approximately one to two hours, two days a month.  In or about
February 2002, the Cleaning Person stopped working at
McLAUGHLIN's District Office, but the payments that she received
from the Campaign Committee did not decrease.  The Campaign
Committee's financial disclosure statements typically described
these expenditures as being made for the purpose of office
cleaning.

D.     Checks Cashed By Foreman 2

48.   In order to carry out another scheme through which
McLAUGHLIN obtained personal use of funds from his Campaign
Committee, between in or about October of 2003 and in or about
January of 2005, Officer 1 provided Foreman 2 with a series of
checks worth a total amount of more than $56,500.

a.   Two of those checks were written to the Management Company, one for an amount of $9,735 and the other for an amount of $9,300.  As with the other checks issued to the Management Company – which totaled over $146,000, as alleged in paragraph 43 above – the Campaign Committee's financial disclosure statements described these two expenditures as payments for consulting services.

b.   Three of the checks provided to Foreman 2, in a total amount of approximately $23,800, were written to a company that performed printing services for McLAUGHLIN's campaign.  The Campaign Committee's financial disclosure statements described these expenditures as being made, respectively, for campaign mailings, campaign literature, and print advertisements.

c.   One of the checks was written to McLAUGHLIN's daughter-in-law, in an amount of $5,000.  The Campaign Committee's financial disclosure statement described this expenditure as being made for consulting services.

d.   One of the checks was written to a catering hall in an amount of $8,700.  The Campaign Committee's financial disclosure statement described this expenditure as being made for the purpose of fund raising.

49.  Officer 1 provided these checks to Foreman 2 because, as alleged above, and as Officer 1 and McLAUGHLIN were aware, Foreman 2 knew of a location where checks could be cashed,

48

regardless of to whom they were made payable.  After Foreman 2 received the Campaign Committee checks from Officer 1, Foreman 2 took them to this location, gave them to an individual, and, a few days later, returned to the same location to retrieve the cash proceeds.  Foreman 2 then provided this currency to Officer 1, who used it to make cash payments to the Construction Manager overseeing work being done at McLAUGHLIN's Nissequogue Residence. None of the checks that Officer 1 gave to Foreman 2 were delivered to the entities to which they were made payable, and those entities did not perform any of the work for which the checks purportedly constituted payment.  To further conceal the nature and purpose of this scheme, Officer 1 fabricated invoices and other documents corresponding to the payments, to create the false impression, if necessary, that the Campaign Committee had made these expenditures for the purposes listed on its financial disclosure reports.

    E.    Payments To McLaughlin's Daughter-In-Law
          And For Wedding-Related Expenses

    50.    On or about August 14, 2004, an individual (the "Daughter-In-Law") married one of McLAUGHLIN's sons.

    51.    From in or about June of 2004 through in or about September of 2004, the Campaign Committee issued four monthly checks made out to the Daughter-In-Law, each in the amount of $5,000.  In the Committee's financial disclosure statements, and in documents that Officer 1 created and maintained, those

payments were described as being made for the purpose of
obtaining consulting services.  In fact, the Daughter-In-Law
performed no work of any kind for McLAUGHLIN or his campaign, and
the checks issued to her were instead used to pay for wedding-
related expenses.

52.  Although three of the four $5,000 checks made out to
the Daughter-In-Law – specifically, the payments made in June,
July, and August of 2004 – were provided to her, she did not
receive the fourth such check, which was dated in September of
2004.  That check, as alleged in paragraph 48.c above, was
instead given to Foreman 2, so that Foreman 2 could cash the
check and return the proceeds to Officer 1, who, in turn, used
the funds to pay for work performed at McLAUGHLIN's Nissequogue
Residence.

53.  On or about August 12, 2004, McLAUGHLIN hosted a
rehearsal dinner for family members, close friends, and members
of the wedding party.  McLAUGHLIN paid for the dinner – which
took place at a restaurant, and cost more than $2,000 – using a
personal credit card.  McLAUGHLIN then submitted his credit card
receipt for the dinner to Officer 1, in order to receive
reimbursement from the Campaign Committee.  McLAUGHLIN also
purchased flowers for the rehearsal dinner, at a cost of more
than $400.  He then submitted the invoice for that expense to
Officer 1, so that the Campaign Committee would pay the bill.  In

September of 2004, the Campaign Committee issued (1) a check to McLAUGHLIN in an amount of more than $2,500, which reimbursed McLAUGHLIN for the cost of the rehearsal dinner and other unrelated expenses, and (2) a check to the florist for more than $400. The Campaign Committee's financial disclosure report indicated that the expenditure for the rehearsal dinner was made for the purpose of fund-raising. The payment to the florist was described as an office expense.

F.   Payments To An Individual With Whom McLaughlin Maintained A Personal Relationship

54. From in or about September of 2000 through in or about November of 2000, the Campaign Committee issued three checks to an individual referred to above as Friend 3. As alleged above, McLAUGHLIN had a personal relationship with Friend 3 during this time period. The Campaign Committee made three payments to Friend 3, in a total amount of $6,000. In the Committee's financial disclosure statements, and in documents that McLAUGHLIN and Officer 1 created and that Officer 1 maintained, those payments were described as being made for the purpose of obtaining consulting services. In fact, Friend 3 was not a consultant and performed no such services for McLAUGHLIN or his campaign; instead, McLAUGHLIN provided Friend 3 with this income because of their personal relationship.

55. During the same period of time, between in or about the summer of 2000 and in or about February of 2001, McLAUGHLIN also

used his official positions to provide Friend 3 with the
following additional benefits: (1) he arranged for Friend 3 to be
hired at the CLC; (2) he caused Friend 3 to receive a $1,000
check drawn on the SLA account, even though Friend 3 had no
involvement with the J Division and had no legitimate reason to
receive those funds; and (3) he arranged for Friend 3 to be
placed on the payroll of a Street Lighting Contractor for a short
period of time, and thus caused Friend 3 to receive income for
purportedly working as J Division member, even though Friend 3
was not an electrician or a member of Local 3 and never performed
any work, of any kind, for the contractor.

    G.    <u>Payments To McLaughlin's Country Club</u>

    56.    In or about January of 1999, McLAUGHLIN applied for and
obtained membership at a country club located on Long Island (the
"Country Club").  The membership included McLAUGHLIN and the
members of his immediate family.  In or about February of 1999,
the Country Club billed McLAUGHLIN for an initiation fee of
approximately $24,400.

    57.    As a partial payment for that initiation fee,
McLAUGHLIN caused the Campaign Committee to send the Country Club
a check dated March 26, 1999 in an amount of approximately
$8,000.  The purpose of that expenditure, according to the
Campaign Committee's financial disclosure report, was fund-
raising.

58.   In order to pay the remainder of his initiation fee, McLAUGHLIN provided the Country Club with a personal check for $16,500.   However, on or about the same date that the Campaign Committee issued the check to the Country Club for approximately $8,000, several additional checks were issued from the Campaign Committee and the SLA account, including: (1) a Campaign Committee check dated March 26, 2000 made out to Officer 1, in the amount of $5,000, which was described on the Committee's disclosure statement as a payment for consulting services; (2) a Campaign Committee check dated March 26, 2000 made out to Officer 2, in the amount of $5,000, which was also described on the Committee's disclosure statement as a payment for consulting services; (3) a Campaign Committee check dated March 26, 2000 made out to the EAA, in the amount of $2,000, which was deposited into the EAA Bank-2 Account and was described on the Committee's disclosure statement as a political contribution; and (4) an SLA check dated March 25, 2000 made out to Officer 2 in the amount of $4,500, which was cashed on or about March 27, 2000.   The combined value of those checks was $16,500, which, as alleged above, was the exact amount of the personal check that McLAUGHLIN provided to the Country Club for the portion of his initiation fee that was not paid for directly with the Campaign Committee check for approximately $8,000.   Officer 1, like Officer 2, did

not provide consulting services to McLAUGHLIN or McLAUGHLIN's campaign and was not compensated for that purpose.

H.   The Check Written To Foreman 2

59.   Foreman 2, in addition to his work as an electrician in the street lighting industry, had extensive experience in performing residential construction, repairs, and carpentry work. Because Foreman 2 possessed such skills, McLAUGHLIN regularly called upon him to perform various projects at McLAUGHLIN's residence and in other locations.  As alleged below, although this work was unrelated to street lighting or traffic signal maintenance jobs, Foreman 2 often found it necessary to work on personal projects for McLAUGHLIN during periods of time when Foreman 2 would have otherwise been attending to his duties as a foreman for a Street Lighting Contractor.  McLAUGHLIN sometimes paid for the building materials that Foreman 2 used to perform these personal tasks.  McLAUGHLIN did not, however, pay Foreman 2 for his time or labor.  Rather, the Street Lighting Contractor that employed Foreman 2 continued to pay his salary, regardless of whether he was attending to his duties for that Contractor or working on personal projects for McLAUGHLIN.  Foreman 2 engaged in this conduct because he feared that if he refused to do so, McLAUGHLIN might well take action against him that would have a substantial adverse impact on Foreman 2's livelihood.

54

60.  On or about June 15, 1999, the Campaign Committee issued a check to Foreman 2 in an amount of more than $5,800. The purpose listed for that expenditure on the Campaign Committee's financial disclosure statement was "OTHER" – meaning, a purpose other than one of the specific categories of spending that the BOE provided, and from which a committee's representative could select in completing this section of the report.  Contrary to the BOE's rules and instructions, which required that an additional explanation be provided for expenditures listed as having been made for "OTHER" purposes, no further explanation was provided for this payment to Foreman 2. In fact, in or around June of 1999, Foreman 2 did not perform any work, and he did not receive a payment of more than $5,800, for any purpose relating to either McLAUGHLIN's campaign or to McLAUGHLIN's work as a State Assemblyman.  Rather, this payment was made to purchase building materials that Foreman 2 needed to complete a residential construction project for McLAUGHLIN's personal benefit.

### RACKETEERING ACT THREE
### Mail Fraud And Wire Fraud

61.  The allegations contained in paragraphs 33 through 60 above are re-alleged and incorporated as though fully set forth herein.

62.   The defendant committed the following acts of racketeering, any one of which alone constitutes the commission of Racketeering Act Three:

## A. Mail Fraud

a.   From in or about March of 1999 through in or about July of 2005, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud his Campaign Committee and its contributors, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused mail matter to be delivered by the United States Postal Service according to the direction thereon, for the purpose of executing such scheme and artifice, to wit, mailings seeking contributions to the Campaign Committee, and indicating only that such contributions would be used to support McLAUGHLIN's reelection campaigns and his legitimate objectives as a member of the New York State Assembly, in violation of Title 18, United States Code, Sections 1341 and 2.

## B. Wire Fraud

b.   From in or about March of 1999 through in or about July of 2005, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised

and intending to devise a scheme and artifice to defraud his
Campaign Committee and its contributors, and to obtain money and
property by means of false and fraudulent pretenses,
representations and promises, caused to be transmitted by means
of wire communications in interstate commerce, signs and signals
for the purpose of executing such scheme and artifice, to wit,
wire transmissions containing financial disclosure reports
submitted to the BOE, which contained false and misleading
entries indicating that the payments described in paragraphs 43
through 60 above were made for purposes relating to McLAUGHLIN's
political campaigns or his work as a State Assemblyman, when, in
fact, those payments were made for McLAUGHLIN's personal benefit,
in violation of Title 18, United States Code, Sections 1343
and 2.

### RACKETEERING ACT FOUR
### Money Laundering
### (Proceeds From Payments To The Management Company)

63.   The allegations contained in paragraphs 33 through 44
above are re-alleged and incorporated as though fully set forth
herein.

64.   From in or about the summer of 2004 through in or about
April of 2005, in the Eastern District of New York and elsewhere,
BRIAN M. McLAUGHLIN, the defendant, together with others known
and unknown, conducted and attempted to conduct financial
transactions involving the proceeds of specified unlawful

activity, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that such financial transactions were designed in whole or in part to conceal and to disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, after having arranged for his Campaign Committee to make fraudulent payments, in the form of checks issued to the Management Company, McLAUGHLIN caused Foreman 1 to transfer cash proceeds from those checks to Officer 1, and caused Officer 1 to transfer such proceeds to pay for construction work and renovations at McLAUGHLIN's Nissequogue Residence, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)and 2.

### RACKETEERING ACT FIVE
### Money Laundering
### (Proceeds From Checks Provided To Foreman 2)

65.   The allegations contained in paragraphs 33 through 39 and 48 through 49 above are re-alleged and incorporated as though fully set forth herein.

66.   From in or about the October of 2003 through in or about March of 2005, in the Eastern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, conducted and attempted to conduct financial transactions involving the proceeds of specified unlawful activity, knowing that the property involved in such

financial transactions represented the proceeds of some form of unlawful activity, and knowing that such financial transactions were designed in whole or in part to conceal and to disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, after having arranged for his Campaign Committee to make fraudulent payments, in the form of checks written to the Management Company, a printing company, McLAUGHLIN's relative, and a catering hall, which Foreman 2 instead cashed, McLAUGHLIN caused Officer 1 to use the proceeds from those checks to pay for construction work and renovations at McLAUGHLIN's Nissequogue Residence, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### RACKETEERING ACTS SIX through EIGHT
### Wire Fraud And Mail Fraud
### (The New York City Central Labor Council)

67.    As with his other official positions, McLAUGHLIN used his authority as the President of the CLC to enrich himself through criminal activity.  In doing so, McLAUGHLIN received assistance from individuals who also helped him to commit other racketeering acts alleged in this Indictment.

### RACKETEERING ACT SIX
### Wire Fraud
### (Foreman 1's Employment As The Director
### Of The Commission On The Dignity Of Immigrants)

68.    In or about 1999, the CLC helped form the Commission on the Dignity of Immigrants (the "Commission").  In information

about the CLC's activities that it provided to the public, the
CLC described the Commission as follows:

> The Commission on the Dignity of Immigrants is a
> task force of labor and clergy leaders that gather
> on a regular basis to discuss immigrant and
> immigration issues and create public policy to
> improve on any negative immigration policy.
>
> In an age where anti-immigration legislation and
> sentiments are widespread throughout our country
> and our own city, the Commission stands as a
> beacon in guiding immigrants towards their rights
> and their fair share of resources.  Together with
> the Archdiocese [of New York], clergy leaders of
> other denominations, community immigrant
> organizations and friendly government agencies,
> the Commission provides real solutions for real
> problems, from naturalization to exploitation.

Through the Commission, the CLC planned and participated in
events to pursue these stated objectives.

　　　69.  In or about August of 2005, McLAUGHLIN arranged for
Foreman 1 to be hired as the Director of the Commission.  At the
time, Foreman 1 had no training or professional experience
relating to immigration issues, and he was not actively involved
in working with immigrant communities.  Moreover, at the time,
Foreman 1 already held positions as (1) a full-time supervisor
for a Street Lighting Contractor, (2) a chiropractor in private
practice, (3) a consultant and event planner for the CLC, and (4)
a part-time Community Liaison in McLAUGHLIN's legislative
District Office.  When McLAUGHLIN informed Foreman 1 that he
would be appointed as the Director of the Commission, Foreman 1
indicated that he could not take on the additional

responsibilities.  McLAUGHLIN, however, advised Foreman 1 that the job would not require any substantial investment of time.  He also instructed Foreman 1 to open a checking account at a particular bank, and to arrange for his paychecks from the CLC to be transmitted by direct-deposit transactions to that account. McLAUGHLIN further instructed that when Foreman 1 received the checks for that account, he should sign the checks, otherwise leave them blank, and provide them to McLAUGHLIN.

70.  In arranging for Foreman 1 to be hired as the Director of the Commission, McLAUGHLIN also took steps to increase the salary for that position by a substantial amount.  As a result, Foreman 1 became the third-highest paid employee of the CLC, behind McLAUGHLIN and the CLC's second-highest ranking officer. The CLC used funds from a United Way grant to pay Foreman 1's salary.  At the outset, Foreman 1 was compensated at a rate that would have provided him with a gross annual salary of more than $81,000.  In or about October of 2005, McLAUGHLIN arranged for Foreman 1 to receive a raise.  Accordingly, beginning in or about November of 2005, the CLC compensated Foreman 1 at a rate that would have provided him with a gross annual salary of more than $94,000.

71.  As McLAUGHLIN instructed, Foreman 1 opened a checking account and arranged to receive his salary from the CLC through direct-deposit transactions.  The CLC had previously retained an

independent payroll company to handle its payroll process.  That company used banks located outside of New York State to initiate direct deposits into employee accounts.  From in or about September of 2005 to in or about April of 2006, the payroll company transmitted weekly deposits into the account that Foreman 1 had opened, in a total amount of more than $41,000; each of those direct deposits was made through an interstate transmission of wire signals.  Including amounts that were deducted and withheld from Foreman 1's pay, and matching contributions that the CLC was required to make under federal law, the CLC paid a total amount of more than $55,000 as a result of Foreman 1's employment.  Foreman 1 resigned from his position as the Director of the Commission in or about March of 2006, after search warrants were executed at the CLC offices and in other locations.  During the course of Foreman 1's employment for the CLC, he devoted little time to his purported responsibilities as the Commission's Director.

72.  In accordance with McLAUGHLIN's instructions, Foreman 1 signed the checks for the account into which his CLC salary was deposited, and he then provided those checks, which he otherwise left blank, to McLAUGHLIN.  McLAUGHLIN then used the checks to pay for a variety of personal expenses, including: (1) rental payments for a residence that he maintained in Queens; (2) payments for charges incurred on personal credit cards; (3)

payments on a home-equity line of credit that he obtained from a
bank; (4) payments for a car driven by one of his children; (5)
mortgage payments for his Nissequogue Residence; (6) payments for
charges incurred on a personal credit card issued by a store that
sold appliances and electronics; (7) payments directly to
himself; (8) payments to his Country Club; and (9) a payment to a
subcontractor that performed work at the Nissequogue Residence.

### Wire Fraud

73.   From in or about August of 2005 through in or about
April of 2006, in the Southern District of New York and
elsewhere, BRIAN M. MCLAUGHLIN, the defendant, together with
others known and unknown, unlawfully, willfully and knowingly,
having devised and intending to devise a scheme and artifice to
defraud the New York City Central Labor Council, and to obtain
money and property by means of false and fraudulent pretenses,
representations and promises, caused to be transmitted by means
of wire communications in interstate commerce, signs and signals
for the purpose of executing such scheme and artifice, to wit,
wire transmissions of direct-deposit salary payments into an
account held by Foreman 1, which, in fact, was not compensation
for work that Foreman 1 actually performed but was instead a
means through which McLAUGHLIN secretly obtained additional funds
from the CLC for his own personal purposes, in violation of Title
18, United States Code, Sections 1343 and 2.

**RACKETEERING ACT SEVEN**
**Mail Fraud**
**(Payments For Consulting Services)**

74.   In or about late 2002, at McLAUGHLIN's direction, Foreman 1 formed the Management Company.  McLAUGHLIN then arranged for the CLC to retain the Management Company to provide consulting services, at a rate of $5,000 per month.  McLAUGHLIN instructed Foreman 1 to use these payments to set up an office and to purchase items that would help to create the appearance that the Management Company was an actual consulting firm; after making these expenditures, McLAUGHLIN further instructed, Foreman 1 should return whatever proceeds remained to McLAUGHLIN. Foreman 1 complied with McLAUGHLIN's instructions.

75.   Prior to forming the Management Company, Foreman 1 periodically worked as a volunteer for the CLC by helping to transport sound equipment that the CLC used for public events. After the CLC began paying the Management Company, Foreman 1 continued performing such tasks.  He did not, however, function as a consultant, and the nature and frequency of his volunteer work did not change in any significant way.

76.   Between in or about December of 2002 and in or about March of 2004, Foreman 1 submitted invoices to the CLC from the Management Company.  The invoices sought payments of $5,000 for "monthly consulting services" relating to "mobilization, sound, transportation and permits."  After McLAUGHLIN approved those

invoices for payment, the CLC issued checks, which were signed by McLAUGHLIN and another CLC officer, to the Management Company. As McLAUGHLIN had instructed from the outset, Foreman 1 returned proceeds from those payments to McLAUGHLIN.  Between in or about January of 2003 to in or about March of 2004, the CLC paid a total of $60,000 to the Management Company for "monthly consulting services" that, as alleged above, were not performed.

77.  Moreover, beginning in or about 2004, McLAUGHLIN arranged for the CLC to retain the Management Company to conduct fund-raising activities in exchange for a percentage of the proceeds generated from that work.  It was McLAUGHLIN's plan, and Foreman 1's understanding, that McLAUGHLIN would receive a substantial share of the income that Foreman 1 obtained from the CLC in this manner.  Between in or about September of 2004 and in or about September of 2005, Foreman 1 received several payments from the CLC – initially through the Management Company, and then through a consulting company that Foreman 1 created to replace the Management Company – which totaled more than $65,000.  Those payments compensated Foreman 1 for work that he did (1) soliciting advertisements for a fund-raising journal that the CLC circulated at its annual awards dinner, and (2) planning a summer golf tournament, which also raised money for the CLC.  As alleged above, in or about 2005, Foreman 1 used a portion of that income to offset losses that he incurred by spending and returning more

65

money for McLAUGHLIN's personal benefit than the Management Company had received from McLAUGHLIN's Campaign Committee for purportedly running McLAUGHLIN's 2004 reelection campaign. During the same period of time, at McLAUGHLIN's direction, Foreman 1 also issued checks in a total amount of more than $19,000, which were used to pay for charges that McLAUGHLIN had incurred on personal credit cards and at his Country Club.

78.   In the course of the Management Company's purported consulting work for the CLC, Foreman 1 received one or more checks from the CLC by mail, and he issued checks that were sent by mail to pay McLAUGHLIN's credit card and country club bills.

### Mail Fraud

79.   From in or about December of 2002 through in or about October of 2004, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud the New York City Central Labor Council, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused mail matter to be delivered by the United States Postal Service according to the direction thereon, for the purpose of executing such scheme and artifice, to wit, the mailing of one or more checks from the CLC to the Management Company, purportedly as payments for monthly

66

consulting services, when, in fact, the Management Company was
not performing such services but was instead being used to
secretly provide McLAUGHLIN with additional funds from the CLC,
as well as the mailing of checks that Foreman 1 issued to pay for
McLAUGHLIN's personal expenses, in violation of Title 18, United
States Code, Sections 1341 and 2.

### RACKETEERING ACT EIGHT
### Mail Fraud
### (The Payment For McLaughlin's Home Security System)

80.  In or about December of 2004, McLAUGHLIN and Officer 1
arranged for a private security company to install a home
security and fire alarm system at McLAUGHLIN's Nissequogue
Residence.  An individual who specialized in the installation and
maintenance of such systems (the "Security Expert") operated this
company and performed the necessary work at McLAUGHLIN's home.
The installation of the system cost $5,875, plus tax.

81.  At McLAUGHLIN's direction, Officer 1 instructed the
Security Expert to create an invoice that could be used to bill
the CLC for the cost of the security and alarm system that was
installed at the Nissequoge Residence, and to send that invoice
to the CLC for payment.  The Security Expert was familiar with
the CLC because he had previously done security-related work at
the CLC offices.  As Officer 1 instructed, the Security Expert
prepared an invoice falsely stating that he had performed an
electronic sweep of the CLC's office space and communications

lines in order to detect the presence of any hidden listening or recording devices, and that no such devices were detected. The invoice further indicated that the amount owed for this work was $5,875, plus tax. The Security Expert mailed this invoice to the CLC. In or about January of 2005, after the invoice was approved for payment, the CLC mailed a check for $5,875 to the Security Expert's company. McLAUGHLIN was one of two CLC officials who signed that check.

### Mail Fraud

82. From in or about December of 2004 through in or about January of 2005, in the Southern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud the New York City Central Labor Council, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused mail matter to be delivered by the United States Postal Service according to the direction thereon, for the purpose of executing such scheme and artifice, to wit, the mailing of an invoice from a security company to the CLC, and the mailing of a check from the CLC to the security company as payment for the work described in that invoice, when, in fact, no such work was performed for the CLC, and the payment

was instead made for McLAUGHLIN's personal benefit, in violation
of Title 18, United States Code, Sections 1341 and 2.

### RACKETEERING ACTS NINE through ELEVEN
### Mail Fraud
### (The New York State Assembly)

83.  As with his other official positions, McLAUGHLIN used
his State Assembly office to enrich himself and others
through acts of criminal conduct.  In doing so, McLAUGHLIN
received assistance from individuals who also helped him to
commit other racketeering acts alleged in this Indictment.

#### Fictitious Positions On McLaughlin's Legislative Staff

84.  As alleged in greater detail below, between in or about
2003 and in or about 2006, McLAUGHLIN created fictitious
positions for Officer 1 and Officer 2 as members of his State
Assembly staff.  In accordance with McLAUGHLIN's instructions,
Officer 2 provided McLAUGHLIN with half of the salary that he
received from the State.  Neither Officer 1 nor Officer 2
performed any substantial work for McLAUGHLIN's legislative
office during the times that they were receiving compensation
from New York State.

85.  In or about November of 2003, McLAUGHLIN proposed that
Officer 2 be put on the State Assembly payroll as a member of
McLAUGHLIN's staff employed at the District Office, and that
Officer 2 would then kick back half of his income from that
position to McLAUGHLIN.  Based on his experience and

conversations with McLAUGHLIN, Officer 2 understood that in carrying out this scheme, he would not be expected to do any real work for the D.O. in connection with this purported employment.

86.   A short time later, in or about November of 2003, one or more members of McLAUGHLIN's State Assembly staff provided Officer 2 with paperwork that he would have to complete in order to be put on the payroll as a D.O. employee.   Officer 2 completed this paperwork and delivered it to McLAUGHLIN's office at the CLC.   On or about the following day, McLAUGHLIN informed Officer 2 that he had received Officer 2's paperwork and intended to take it to Albany.

87.   Among the employment-related forms that Officer 2 received was a document titled "New York State Assembly Employee Job Description."   The form indicated that Officer 2 would be working for McLAUGHLIN as a "Community Liaison."   The form further indicated that during the course of his employment, Officer 2 would have a series of duties, including: completing special projects involving "community outreach"; representing the McLAUGHLIN at meetings; meeting and preparing for meetings with constituents in the District Office or elsewhere; advising McLAUGHLIN on pending community events; and acting as a liaison with specific groups, such as labor unions and school boards. Another form that Officer 2 received in connection with this purported employment indicated, among other things, that he was

70

assigned to work at the D.O. and that McLAUGHLIN's Chief Of Staff would be his supervisor.

88. From in or about November of 2003 through the end of December of 2003, Officer 2 signed time sheets for this position, which covered successive two-week pay periods beginning on October 9, 2003 and ending on December 31, 2003. According to the time sheets, during that period of time, Officer 2 worked 7 hours a day, 5 days a week, for a total of 70 hours during each two-week period. McLAUGHLIN's Chief Of Staff signed the time sheets as Officer 2's supervisor, beneath the following representations: "(1) The employee named above [Officer 2] was employed by this office during the time period covered by this time sheet. (2) Such employee has, during the reporting period, performed the proper duties assigned to him/her. (3) To the best of my knowledge, the information contained in this report is correct in all respects." Officer 2's time sheets were sent by mail from the District Office to Albany as part of the normal payroll process for D.O. employees.

89. Over the years, at McLAUGHLIN's request, Officer 2 attended meetings for McLAUGHLIN from time to time. From October through December of 2003, however, during the course of Officer 2's purported employment as a "Community Liaison" for the D.O., Officer 2 did not attend any such meetings, and he did not perform the other responsibilities listed on the New York State

71

Assembly Job Description form described above in paragraph 87. Moreover, Officer 2 did not work at the D.O. and was not there for substantial periods of time on a daily basis during the weeks between October and December of 2003; indeed, during that time period, Officer 2 held a full-time job working as a street lighting foreman for a Street Lighting Contractor.

90.   In or about January of 2004, as a result of Officer 2's purported employment at the D.O., he received two paychecks from New York State in a total amount of approximately $4,555.  Those checks had been sent, by mail, from Albany to the District Office.

91.   On or about January 22, 2004, McLAUGHLIN met with Officer 2.  During their conversation, Officer 2 told McLAUGHLIN that he had "the payroll" with him, and that it had come out to $4,555.  At McLAUGHLIN's suggestion, Officer 2 and McLAUGHLIN then went to a different location and continued their conversation in private.  After they entered a car and discussed a different scheme – which involved the possibility that Officer 2 would become a consultant for the CLC and kick back a portion of his salary to McLAUGHLIN – Officer 2 provided McLAUGHLIN with $2,300 in cash.  Officer 2 and McLAUGHLIN then counted the currency to make sure that the amount was correct, and McLAUGHLIN returned one of the bills to Officer 2.

92.  In or about March of 2005, McLAUGHLIN proposed to put Officer 1 on the D.O. payroll.  Officer 1 met with McLAUGHLIN on or about March 12, 2005.  During their conversation, McLAUGHLIN and Officer 1 reviewed various employment-related forms, some of which McLAUGHLIN instructed Officer 1 to sign.  One of the forms was a "New York State Assembly Job Description," similar to the one that Officer 2 had received when he was placed on the D.O. payroll in late 2003.  The duties that Officer 1 would be assigned, according to this official Job Description, included: representing McLAUGHLIN at meetings; advising McLAUGHLIN on pending community events; acting as a liaison with specific groups, such as labor unions and school boards; allocating work assignments; preparing and making recommendations for allocations of the McLAUGHLIN's budget; receiving office visitors; receiving and placing telephone calls; reading and distributing newspaper and magazine articles; and attending to other necessary duties. During the same meeting, McLAUGHLIN informed Officer 1 that his job title would be "Special Assistant to the Assemblyman." McLAUGHLIN also indicated that Officer 1's position would be part-time for an indefinite period, and that Officer 1's annual salary would begin at $25,000.  In addition, McLAUGHLIN instructed Officer 1 to sign a form indicating that Officer 1 had read a booklet titled "Know The Selected Laws Governing The Conduct Of The Members, Officers, And Employees Of The New York

73

State Legislature." McLAUGHLIN provided Officer 1 with a copy of this booklet, which contained various provisions of state law governing legislative officials and employees, including Penal Law § 195.20, which made it a felony for a public servant to defraud the state government.

93.   During the course of his purported employment as a Special Assistant to the Assemblyman, Officer 1 signed a series of time sheets.  On various occasions, he signed such time sheets when they were still blank, in advance of the relevant pay periods.  The individuals who attested to the accuracy of Officer 1's time sheets, as his supervisor, included McLAUGHLIN and his Chief Of Staff.  Officer 1's time sheets typically indicated that he worked four or five hours a day, four or five days a week, for a total of 20 hours per week and 40 hours for each two-week pay period.  Some of Officer 1's time sheets indicated that he continued to work such hours during periods of time when Officer 1 was, in fact, away from New York City on vacation with his family.  Officer 1's time sheets were sent by mail from the District Office to Albany as part of the normal payroll process for D.O. employees.

94.   Beginning in or about April of 2005, Officer 1 began receiving payroll checks from New York State, which had been sent, by mail, from Albany to the District Office.  Officer 1 held his position on McLAUGHLIN's State Assembly staff until

McLAUGHLIN terminated Officer 1's employment in or about March of
2006, after search warrants were executed at McLAUGHLIN's
District Office and in other locations.  Over the course of
Officer 1's employment, he received gross salary payments from
New York State in a total amount of more than $32,000.

     95.   During Officer 1's purported employment as a "Special
Assistant" to McLAUGHLIN, he held a full-time position as a
foreman working for a Street Lighting Contractor.  He also
undertook additional responsibilities as a J Division officer,
and as the Treasurer of McLAUGHLIN's Campaign Committee.  In
those capacities, over the years, Officer 1 performed various
tasks for McLAUGHLIN relating to Local 3, the CLC, and the
administration of McLAUGHLIN's campaign fund.  He also assisted
McLAUGHLIN in carrying out various criminal schemes alleged in
this Indictment.  In addition, at McLAUGHLIN's request, Officer 1
occasionally attended meetings or performed other work for
McLAUGHLIN that related to McLAUGHLIN's work as a State
Assemblyman.  During the period of Officer 1's purported
employment for the D.O., however, he was not called upon to
devote any substantial time, and never approached devoting 20
hours during the course of any week, to performing the types of
duties that he was purportedly assigned as a "Special Assistant"
to McLAUGHLIN.

## RACKETEERING ACT NINE
## Mail Fraud
## (Employment Of Officer 2)

96.   The allegations contained in paragraphs 83 through 91
above are re-alleged and incorporated as though fully set forth
herein.

97.   From in or about November of 2003 through in or about
January of 2004, in the Southern District of New York and
elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with
others known and unknown, unlawfully, willfully and knowingly,
having devised and intending to devise a scheme and artifice to
defraud the State of New York, and to obtain money and property
by means of false and fraudulent pretenses, representations and
promises, caused mail matter to be delivered by the United States
Postal Service according to the direction thereon, for the
purpose of executing such scheme and artifice, to wit, the
mailing of time sheets purporting to reflect the hours that
Officer 2 spent working as a member of McLAUGHLIN's District
Office staff, and the mailing of state payroll checks to
compensate Officer 2 for such purported work, when, in fact,
Officer 2 did not perform the work for which he received
compensation and instead provided McLAUGHLIN with a share of his
salary, in violation of Title 18, United States Code, Sections
1341 and 2.

## RACKETEERING ACT TEN
## Mail Fraud
## (Employment Of Officer 1)

98.   The allegations contained in paragraphs 93 through 95 above are re-alleged and incorporated as though fully set forth herein.

99.   From in or about April of 2005 through in or about March of 2006, in the Eastern District of New York and elsewhere, BRIAN M. McLAUGHLIN, the defendant, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud the State of New York, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused mail matter to be delivered by the United States Postal Service according to the direction thereon, for the purpose of executing such scheme and artifice, to wit, the mailing of time sheets purporting to reflect the hours that Officer 1 spent working as a member of McLAUGHLIN's District Office staff, and the mailing of state payroll checks to compensate Officer 1 for such purported work, when, in fact, Officer 1 did not perform the work for which he received compensation, in violation of Title 18, United States Code, Section 1341 and 2.

77

## RACKETEERING ACT ELEVEN
## Mail Fraud
### (Reimbursements For Per Diem Expenses)

100. As a member of the State Assembly, McLAUGHLIN was entitled to receive reimbursement for his expenses, on a *per diem* basis, for days that he spent away from his legislative district attending to his official duties.  Between in or about 2003 and in or about 2005, as alleged in more detail below, McLAUGHLIN submitted requests for such reimbursement containing false claims that he was in Albany on particular days when, in fact, he was elsewhere, and he took additional steps to prevent the detection of that misconduct.

101. Over the years, McLAUGHLIN periodically instructed Officer 2 and at least one other J Division foreman to drive to Albany and then back to New York City.  During such trips, McLAUGHLIN directed the driver either to collect toll receipts, or, in more recent years, to use McLAUGHLIN's E-ZPass device in one direction and the driver's own E-ZPass device in the other direction.  McLAUGHLIN issued these instructions in order to manufacture evidence that would, if necessary, provide support for a claim that he was in Albany during times when, in fact, he was elsewhere.  The foremen who made these trips to Albany for McLAUGHLIN did so during time when they would have otherwise been working for, and when they were receiving compensation from, Street Lighting Contractors.

78

102. McLAUGHLIN and, at his direction, members of his legislative staff completed requests for *per diem* reimbursements using vouchers that the State Assembly provided for that purpose. The completed vouchers were then submitted, by mail, to the Finance Department of the State Assembly. McLAUGHLIN executed the completed vouchers and, in doing so, certified that: (1) the expenses listed were incurred in the rendering of legislative duties; (2) the claim set forth in the voucher was just, true, and correct; and (3) the balance shown was actually due and owing. After receiving such vouchers, the Finance Department mailed reimbursement payments to McLAUGHLIN.

103. Specific instances of conduct in which McLAUGHLIN and others engaged to further this scheme include the following:

a. During telephone conversations that occurred on or about November 23, 2003, McLAUGHLIN instructed Officer 2 to drive to Albany and back to New York City, using McLAUGHLIN's car, on or about November 24, 2003. McLAUGHLIN repeatedly instructed Officer 2 that in making this trip, Officer 2 should use his own E-ZPass on the way to Albany and McLAUGHLIN's E-ZPass on the way back to New York City. McLAUGHLIN reminded Officer 2 about which E-ZPass to use in which direction on or about the morning of November 24, 2003, before Officer 2 made the drive to Albany. Officer 2 complied with McLAUGHLIN's instructions. Through a voucher that McLAUGHLIN executed, and certified as being true and

79

correct, on or about November 25, 2003, he claimed that he was entitled to reimbursement for a full day in Albany on November 23, 2003 and a partial day in Albany on November 24, 2003.  The State Assembly reimbursed McLAUGHLIN for the full amount that he sought.

b.  Officer 2 met with McLAUGHLIN in New York City on or about February 2, 2005.  During the conversation, McLAUGHLIN stated that he had "snuck out of Albany."  McLAUGHLIN then instructed Officer 2 to drive McLAUGHLIN's car to Albany the next day, using Officer 2's E-ZPass on the way up and McLAUGHLIN's E-ZPass on the way back.  In that way, McLAUGHLIN explained, he would "get credit" for being in Albany that night, and the next morning for a vote.  McLAUGHLIN then repeated his instructions about which E-ZPass device Officer 2 should use in each direction, and he stated: "That's my record I was up there last night."  Through a voucher that McLAUGHLIN executed, and certified as being true and correct, on or about February 3, 2005, he claimed that he was entitled to reimbursement for a full day in Albany on February 2, 2005 and a partial day in Albany on February 3, 2005.  The State Assembly reimbursed McLAUGHLIN for the full amount that he sought.

c.  McLAUGHLIN met with Officer 1 and Officer 2 on or about February 16, 2005.  During the conversation, McLAUGHLIN instructed that when Officer 2 drove up to Albany later that