*May 5, 2009*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                       :

UNITED STATES OF AMERICA,

                       :

         Plaintiff,

                       :

       -against-                         Case No. 06-cr-965 (RJS)

                       :

BRIAN McLAUGHLIN,

                       :

         Defendant.

                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM ON BEHALF OF
## BRIAN M. McLAUGHLIN IN AID OF SENTENCING

Amory W. Donelly, Esq.
HOWREY LLP
153 East 53rd Street
54th Floor
New York, NY 10022
(212) 896-6500

Michael F. Armstrong, Esq.
LANKLER & CARRAGHER LLP
845 Third Avenue, 17th Floor
New York, NY 10002
(212) 812-8910

*Attorneys for the Defendant*

DM_US:22118026_1

**Sentencing Memorandum**

This memorandum is respectfully submitted, on behalf of defendant Brian McLaughlin, to aid the Court in imposing sentence, following Mr. McLaughlin's guilty plea, on March 7, 2008 to counts 1 (except Racketeering Acts 4 and 5) and 44 of the indictment.

**Summary of Brian McLaughlin's Personal Background**

Mr. McLaughlin was born on April 30, 1952 in New York. He has been a resident of Flushing for thirty years. His father passed away in 1999 and his mother is still living in Flushing. Growing up, Mr. McLaughlin's immigrant father worked as an electrician and his mother worked in retail.

Mr. McLaughlin joined the electrical union training program as an apprentice after graduating from High School. He became a journeyman electrician in 1977, following in the footsteps of his father and grandfather. While working in the electrical industry, he continued his education, receiving a Bachelor of Science degree from Empire State College of the State University of New York and a Masters degree in Industrial Labor Relations from New York Institute of Technology.

In the eighties he worked as a pension director for the Joint Industry Board of the Electrical Industry. In 1987, Mr. McLaughlin began his career in politics in as a part-time Local 3 Union business representative and as a full-time Assistant President of the Central Labor Council. He was elected to the State Legislature as the New York State Assemblyman representing Flushing in 1992. As an Assemblyman Mr. McLaughlin was the author of more than 40 state laws, including legislation such as, VaSean's law, which punishes drunk drivers, the Immigration Assistance Services Act, directed at immigrant scam artists, and other quality of

- 1 -

life measures such as: restricting the proliferation of bars and taverns, improving access to health care in his community and helping Holocaust survivors qualify for State assistance.

Mr. McLaughlin's first marriage, to Andrea Nelson, lasted nineteen years. He had two children with Ms. Nelson, Brian, now age 35, and Kelly, now 31. Mr. McLaughlin married Eva Moss in November of 1993 and they have a daughter, Meaghan, who is now nine years old. Mr. McLaughlin also adopted Eva's children from a prior marriage, Robert, now age 25, and Cassie, now age 23. He has strong relationships with all five children.

Since his indictment Mr. McLaughlin has been working a variety of long hour and low wage jobs to support his family. From June to October, 2007 he was employed as an electrician. From October 2007 to March 2008, Mr. McLaughlin was an instructor for Master Cabbie, a private taxi service, instructing individuals seeking to secure a taxi and limousine license. On the weekends he drove a stretch limousine for one company and a yellow cab for another until the Taxi and Limousine Commission revoked his license on April 11, 2008, because of his guilty plea. In April 2008 Mr. McLaughlin returned to work as a laborer, working in a water filtration plant in the Bronx. He was laid off on January 26, 2009 in connection with a reduction in force.

Mr. McLaughlin began attending Alcoholics Anonymous ("AA") on December 14, 2005, less than a year before the indictment was returned against him. He attends AA meetings four times a week and has been sober for over three years.

## Factors Relating to McLaughlin's Sentencing

Since before he was indicted, on October 17, 2006, approximately two and one half years ago, Mr. McLaughlin resolved not to fight or try to deny the pending charges. Rather, he admitted what he had done, tried to make amends and did his best to ameliorate the punishment

that necessarily was to come by assisting the Government in understanding the full scope and nature of the illegal activities in which he had become involved.

At the same time, he was forced to reevaluate his life, and face the character and behavioral deficiencies that had led to or mirrored his criminal actions, among them greed, alcoholism, excessive ambition and neglect of family values.  During the past two and one-half years he has done his best, he believes with considerable success, to correct those deficiencies. As reflected in many letters of support written by those around him, he has found that the life he has been forced by circumstances to adopt is actually more satisfying than the one that led to his downfall.  (These letters are respectfully submitted as Exhibits 1 through 97.)  Mr. McLaughlin has received many letters, to pass on to the Court, from friends, colleagues and clergy.

This realization was possible because, as serious as his criminal acts were, they were transposed upon, rather than springing from, his basic character and values.  Indeed, he had started to change his behavior in some respects before awareness of the Government's investigation obliged him to face head-on what his life had become (he joined AA, sought marital counseling, and abandoned plans for re-election to the Assembly).

Brian McLaughlin has done much good in his life and devoted great efforts to helping others, even during the period of his transgressions.  Given a chance, once his debt is paid, he will certainly return to living in a manner that is constructively rewarding to himself and others.

We respectfully ask that the Court take into consideration the following factors in imposing sentence on Brian McLaughlin.  A lengthy dissertation on *US v. Booker*, 543 U.S. 200, 125 S. Ct. 738 (2005), *US v. Crosby*, 397 F.3d 103 (2d Cir. 2005) and their progeny is not necessary to establish that the Court now has discretion to rely on factors concerning a defendant's character, conduct and circumstances that might not have justified a formal

- 3 -

downward departure motion under the pre-Booker Sentencing Guidelines. Such factors may warrant a more lenient sentence than might have been called for under the Guidelines, one that is "permissible" and not "unnecessarily harsh" under 18 U.S.C. § 3553(A).

## Remorse and Acceptance of Responsibility

Many of the letters written on behalf of Mr. McLaughlin reflect the fact that he has come to sincerely regret what he did and has accepted responsibility for his wrongdoings. One family friend describes him as "on a road that has taught him how to better himself as a human being, and . . . he will continue on this road of learning and growth as it has bumbled [sic, humbled?] him ..." (See letter from April Planken, Ex. 40.) Mr. McLaughlin's Bishop describes the "difficulty he has put himself into" as having a "marked effect on Brian's life as well as a profound effect on his entire family." (See letter from the Most Reverend Ignatius A. Catanello, Ex. 7.) The Bishop goes on to say that Mr. McLaughlin is "extremely remorseful for all that has occurred." *Id.*

Many letters reflect this remorse. His friends write that he "entirely regrets any bad decisions he may have made in the past." (See letter from Jenna Sisti, Ex. 43.) His former pastor writes that "in his conversations and encounters with Mr. McLaughlin" he has found him to be "committed to growing spiritually." (See letter Msgr. Brian J. McNamara, Ex. 31.) He believes "Mr. McLaughlin has undergone a great conversion over the past few years." *Id.* Jack Rudin, a friend for over fifteen years, writes that Brian has "expressed his regrets and desires to take full responsibility for what he has done." (See letter from Jack Rudin, Ex. 42.) Mr. Rudin closes with the statement that "[o]n a daily basis [Brian] strives to live a better, more selfless life." *Id.*

A colleague writes that in their daily conversations, Brian has expressed sorrow "for his crimes and for his betrayal of family, union and public trust, as well as his sins against God. He

- 4 -

has come to the realization that he has caused much harm to many others, as well as himself, due to his own lust and greed. Brian has not expressed denial nor sought to shift blame, but rather has expressed …his desire to take responsibility for what he has done." (See letter from Peter A. Allone, Ex. 2.) Mr. Allone finds Mr. McLaughlin to be a man with a "changed heart" who "no longer lives for his own selfish desires, but is committed to respecting the law." *Id.*

His supporters ask that Your Honor consider Brian "a good man" who made "wrong choices" and is "more good than bad." They describe him as a "hard working honest man" who "went down the wrong path" (See letter from Gerano Mezzasalma, Ex. 30), and a "very good person who got caught up in a situation that composed [sic, compromised?] his judgment." (See Letter from Kevin White, Ex. 46.) They describe him as someone whose "contributions to society far outweigh any mistakes he may have made." (See letter from Paul Collins Jr., Ex. 11).

Mr. McLaughlin's crimes were committed side-by-side with his continued involvement in the many good works that characterized his early life. His hypocrisy in simultaneously following these two inconsistent paths was lost on him until he was forced to acknowledge his wrongdoing, without rationalization.

We respectfully suggest that everyone who has dealt with Mr. McLaughlin in the last 2-1/2 years agrees that he has faced up to his responsibility for his crimes and is in no possible danger of ever allowing himself to repeat such behavior.

### Rehabilitation, Reassertion of Basic Values

Whether a defendant has rehabilitated himself is a factor the Court may consider in imposing sentence, under the Guidelines or otherwise. The Court should take into account a defendant's dedication and effort in rehabilitating himself, thereby making himself an example to others. Moreover, a rehabilitated individual is necessarily less likely to commit further

- 5 -

wrongdoing and it is, therefore, less necessary to isolate him. On the contrary, someone who has shown he can contribute to society, should not unnecessarily be prevented from doing so. Under the Guidelines, "a sentencing judge may exercise discretion and depart from the applicable guideline range in light of a defendant's efforts toward rehabilitation, provided those efforts are extraordinary." *U.S. v. Hawkins*, 380 F.Supp.2d 143, 151 (2005); *see, e.g., U.S. v. Bryson*, 163 F.3d 742, 746 (2d Cir.1998); *see also U.S. v. Rosado*, 254 F.Supp.2d 316, 321 (S.D.N.Y.2003) (Rehabilitation "must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner."); U.S. v. Blake, 2000 WL 286685, at *11 (E.D.N.Y. Mar. 15, 2000) (The '[p]ower to depart may be based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior.")

Such rehabilitation is not limited to turning a wholly "bad" life around. The "relatively decent, generally law-abiding citizen who errs more than once, or over some extended period, but once prosecuted, is likely to be done with crime for good" is also entitled to demonstrate that a return to "normal" or "average" is extraordinary. *U.S. v. Hawkins*, 380 F.Supp.2d at 159.

Post Booker, such a person may also benefit from the much broader and more flexible section 3553 of title 18 of the United States Code, which requires the court to avoid a sentence "greater than necessary." 18 U.S.C. § 3553(a). Even under the Guidelines "there is a strong argument to be made that 'extraordinary rehabilitation' is satisfied when a relatively decent person falls into bad conduct, but immediately and permanently repents." *U.S. v. Hawkins*, 380 F.Supp.2d at 159 – 160 (taking the view that rehabilitation "signifies a return to a former self, not the creation of a new person.")

- 6 -

"Accepting as a founding principle that a human being is always more than the worst thing he or she has ever done, the restorative definition of rehabilitation (as a 'return to the good') is appropriate" and "lead[s] to the result the law seeks under section 3553: a law-abiding member of society." *Id* at 160. "A person without a serious criminal history who has made a remarkable shift back to the person she was before criminality, or even beyond, should not be precluded from relief ..." *Id.*

Mr. McLaughlin has demonstrated such a "return to good." Before he became involved in the crimes that led to this indictment, Mr. McLaughlin was hardworking and dedicated to improving his community. He is fully capable, and of course eager, to resume that role.

Many of the letters written on Mr. McLaughlin's behalf, cite specific examples which reflect the kind of person he was before he began his criminal behavior, and the type of person he has returned to being. The letters paint a picture of a man who always intended to contribute to his community and did so on a large and small scale. He is a man who has been humbled by the exposure of his wrongdoing and his own full realization of how wrong his behavior was. But he also feels benefited by the wake-up call which has returned him to religion, sobriety, and family.

A particular characteristic of Mr. McLaughlin is the energy he devoted to helping the youth of his community. The athletic director at St. Andrew Avellino School in Flushing writes that Brian "cared deeply" about the school's sports program and attended "basketball and baseball games" and "awards dinners." He goes on to say that the "Athletic Association always operated at a loss because some families couldn't afford the fees" and Brian helped to supply funding "so these kids could participate." (See letter from Thomas B. Catalanotta, Ex. 6.) Kevin White, treasurer of the St. Andrew Avellino Athletic Association, wrote in support of Mr.

- 7 -

McLaughlin that his athletic association "always received the funding from Mr. McLaughlin's office that [it] was supposed to receive." (See letter from Kevin White, Ex. 46).  Mr. White writes that Mr. McLaughlin "helped raise funds for [the] programs, and lent support in whatever way possible to help the youth of our community." *Id.*

A Girl Scout leader in the Broadway Flushing community writes of the support she received from Mr. McLaughlin at "many events – Christmas Caroling and Tree Lighting in Bowne Park along with Silver & Gold Award ceremonies for many girls".  She writes that he instilled "in many young people the importance of making a difference in our community." (See letter from Donald & Martha Prirone, Ex. 39.)  Another family friend writes that Mr. McLaughlin always made the young people in his community feel like they had something to bring to the table and "taught [them] that it would be up to [them] to make things better for the future." (See letter from Donald P. Pirone Jr, Ex. 38.)[1]

Mr. McLaughlin's colleagues in the labor movement describe him as someone who always took time to assist others and was always willing and eager to organize support for union members.  The president of the steamfitters union cites Mr. McLaughlin's dedication to the 9/11 victims at ground zero where he "work[ed] with federal, state and local authorities to legislate and allocate necessary support to devastated families and victims." (See letter from John Torpey Ex. 45.)  He writes that the "New York City Central Labor Council raised one million dollars for

---

[1] Mr. McLaughlin's dedication to helping young people in general and athletic programs in particular makes particularly painful the extensive focus in the tabloids on the allegation – to which he has pleaded guilty – that he took money from the Electchester Athletic Association ("EAA"), the operator of a Little League.  Mr. McLaughlin had a major role in rescuing EAA, when it fell upon hard times, and was its consistent supporter.  At the time, he rationalized his taking some of the money contributed to EAA by allowing himself to be satisfied that the childrens' activities were always fully funded out of New York State discretionary grants and that unused funds were actually returned to the State in some years.  He now recognizes the shallowness of excusing his stealing by thinking he was only taking from funds that he believed were in excess of the needs of the children.

the 647 union members and families affected by the attack, under Brian McLaughlin's leadership." *Id.*

A fellow pension director with the Joint industry Board for the Electrical Industry wrote that "in every contact [he has] ever had with Mr. McLaughlin, he was always very concerned with the health and welfare of all members of his union.  He pioneered the development of geographical retiree associations in New York, New Jersey and Florida." (See letter from John E. O'Connor, Ex. 32.)

Chick Donahue, a former political director of sandhog union, writes that he "often went to Brian with everyday problems of [his] members and Brian always had time to help.  He especially was helpful in getting younger people into apprenticeship programs insuring them a career in the building and construction trades and a job where they could support their family." (See letter from John C. Donohue, Ex. 15.)

Mr. McLaughlin's friends describe him as someone who was always there for them, "to give a hand or good advice…" (See letter from Charles A. King, E. 20.)  Walter Coughlin, for example, credits Mr. McLaughlin with his current sobriety, writing that Mr. McLaughlin "stepped in to help [him] when [he] was forsaken by everyone else – helping [him] to get into recovery programs, providing [him] with emergency funding, and helping [him] secure housing when [he] recovered from 30 years of alcoholism and homelessness." *Id.*

His neighbors and constituents describe Mr. McLaughlin as the "type of person who would give you the shirt off of his back" and "always put his family and friends first." (See letter from Valerie Fleck, Ex. 16.)  "[E]very time there was a problem concerning quality of life in [the] neighborhood it would be resolved by [Brian]." (See letter from Janet L. Malone, Ex. 21.) Ms. Mary DeLoria writes of the "joy, kindness, and politeness" that Mr. McLaughlin showed her

DM_US:22115615_1

elderly mother over the years – "never forget[ting] her birthdays" and calling for her at the hospital. (See Letter, Ex. 14.) Ms. Joyce Granoff writes that Mr. McLaughlin helped her "obtain … a senior citizen benefit that helps tenants be entitled to be saved from future rent increases" and contest an erroneous retail store bill on her behalf. (See letter, Ex. 18.)

Mr. McLaughlin's constituents describe him as someone who "came through for people." One woman writes how Mr. McLaughlin discovered that her mother was "alone and helpless" with "three children with various health problems." She states that Mr. McLaughlin "essentially saved [her] family" by directing her mother to "different charities and programs." See letter from Christina Conaty, Ex. 12.) Many neighbors cite to Mr. McLaughlin's efforts to clean up Bowne Park, making it a place people could enjoy again. (See letters from Thomas B. Catalanotto, Ex. 6), Christina Conaty, Ex. 12, Donald R. Pirone Jr, Ex. 38.) Another writes that she was raising two sons alone when one of them got involved with drugs. She credits Mr. McLaughlin with the fact that her son is now drug-free and gainfully employed because "Brian was always there" as a "role model for [her] son, always advising and counseling him on the dangers of drug abuse." (See letter from Evelyn Riccobono. Ex. 41.)

Many of Mr. McLaughlin's supporters point to Mr. McLaughlin's work ethic, writing that he has "worked all kinds of off jobs in order to do the right thing, provide for his family and hold them together." (See letter from Donald & Martha Pirone, Ex. 39.) His employer at the taxi cab school, Terence Gelber, writes that Mr. McLaughlin often stayed late, "off the clock, helping the slowest students prepare for exams." (See letter, Ex. 17.) Mr. McLaughlin often told Mr. Gelber how "happy he was to help people who had not had the chances he had." *Id.* Mr. Gelber goes on to say that Mr. McLaughlin's skills are "valuable to those less talented, and the cost of incarceration so great" that "Solomon's wisdom" led to Mr. McLaughlin teaching at the

- 10 -

NYC Taxi Academy, [t]eaching those who aspire to the American Dream [Brian McLaughlin] abused." *Id.* Mr. Gelber even offers to "guarantee [Mr. McLaughlin] a job if such a promise could help the [C]ourt reach a work mandated solution." *Id.*

## Alcohol Abuse

Mr. McLaughlin's wrongdoing was abetted significantly by his substantial misuse of alcohol. His Bishop, Reverend Ignatius A. Catanello, observes that "addiction to alcohol played a major role in his current situation." (See letter from Most Reverend Ignatius A. Catanello, Ex. 7.) In this respect, Mr. McLaughlin has completely turned himself around. He has been a faithful member of his local AA since just before he became aware of the Government's investigation.

In a letter signed by twelve of his friends in the AA program, Mr. McLaughlin is described as a "sober and a responsible member of AA" who has "turned his life around" and deserves "an opportunity to begin a new way of life." (See group letter, Ex. 1.) The signatories of the letter state that "in his sharing at various AA meetings Mr. McLaughlin has expressed deep remorse for his behavior which led to his indictment." *Id.* Another friend from AA attests to Mr. McLaughlin's dedication to sobriety, recounting how within Mr. McLaughlin's "first 90 days of sobriety he first learned of the investigation, and ultimately his indictment." (See letter from Paul Belliveau, Ex. 4.) Despite those "trying times", Mr. McLaughlin "stayed sober." *Id.*

Mr. McLaughlin's AA sponsor, Dennis Mannix, submitted a letter recounting his own experience appearing before Justice Peter McQuillan of the New York Supreme Court, who convicted him of criminally negligence homicide. (See letter from Dennis Mannix, Ex. 22.) Despite the recommendation from the probation department, Justice McQuillan took a chance and gave Mr. Mannix probation. Mr. Mannix writes that today he has nearly thirty years of

sobriety and is "active in AA and speaks in institutions in and around Manattan." "[His] daughter who is 26 will start Medical School." *Id.* Mr. Mannix writes that he "ask[s] God everyday to bless Judge McQuillian for giving [him] the opportunity not to become an animal in the prison system and speak the rest of my life one day at a time going to meeting." *Id.* Mr. Mannix describes Brian as a man who has "come up from the throws of alcohol abuse in the just over 3 years of sobriety. He came to us in A.A. before he was arrested, he was on his way with God's grace to sobriety. He has been a power of example of Gods power to me and countless others. He will do no one any good in jail." *Id.* Mr. Mannix asks "what was asked of Peter McQuillan on my behalf to show Brian leniency with no jail time."

## Health

Mr. McLaughlin is 57 years old. In 2002 he underwent surgery to remove his cancerous prostate gland, but tests indicate that the disease lingers. He recently underwent radiation therapy. Although he appears to now be in good health, we suggest that the fact of his being a somewhat tentative cancer survivor is relevant to the genuineness of his resolve to make the most of the remainder of his years, honestly.

## Family

Far and away the most important factor in Mr. McLaughlin's life from now on is his desire to be as close to his family as he can. Letters from Mr. McLaughlin's family members show their strong faith in him. Even his estranged wife and ex-wife have written Your Honor asking for leniency.

It is true that, during the height of his career, Mr. McLaughlin's unchecked ambition sometimes got the best of him and he neglected his family. His first wife, with whom he amicably separated in 1991, writes a letter which focuses on his early accomplishments, pointing

out that he was "perhaps at times over zealous in his career." (See letter from Andrea McLaughlin, Ex. 23.) She goes on to write, "Brian never had a chance to mature without tremendous pressure, drive, expectations, and accomplishments as part of his daily life." *Id.*

His oldest daughter Kelly writes, "As my father achieved higher status both politically and within the labor movement, his ambition and desire to move up the ladder took priority over other areas of his life." (See Letter from Kelly McLaughlin, Ex. 27.) His son, Brian, writes that his "father was driven, pulled and triggered in way too many directions and wore way too many hats and ultimately made some very poor decisions." (See letter from Brian P. McLaughlin, Ex. 24.) Today, all his children feel as though he has re-devoted his life to them. Mr. McLaughlin's son, Robert, writes that he has "a blessed relationship with [his] dad." (See letter from Robert McLaughlin, Ex. 28.) His daughter Cassie writes that when Mr. McLaughlin adopted her and her brother, Robert, as a young girl she felt "blessed" to have the love of such a father, who she sees as her "greatest teacher." (See letter from Cassie McLaughlin, Ex. 25.) She has only grown to admire him "more and more" in recent years. *Id.*

His children are proud of him for turning his life around. Cassie writes that her father "has taken steps to completely change his life in the past three years consistently and whole heartedly. He has changed his once upon a time life style, to a regular working class citizen." *Id.* Cassie goes on to say that her father has "acknowledged his wrongdoings." *Id.* She writes that he was "completely knocked down," but "put his pride and ego aside to face the world head on and rebuild his live back up to the absolute best of his ability." *Id.*

Mr. McLaughlin's brother, Stephen McLaughlin, writes, "Brian had to own up to his crime and his immoral behavior, not just to the courts, but to himself. After deep soul searching

- 13 -

he began by renewing his relationship with his children." (See letter from Stephen McLaughlin, Ex. 29.)

His son, Brian, writes that Mr. McLaughlin has "acknowledged [his] poor choices and has tried to right his wrongs over the past three years." (See letter from Brian P. McLaughlin, Ex. 24.) Brian adds that his father's "fall from grace has been a heavy fall two powerful and good paying jobs, influence and leadership in his union and community replaced by shame and guilt. Nonetheless, [his father] has worked hard to improve his life and as a result has united [the] family." *Id.*

In his letter to Your Honor, his son Robert, writes that "[p]rior to the FBI coming to [the McLaughlin's] door in March 2006 [his] father was already on the path of making right his wrongs to his family. In "December of 2005 [his] father started to go to Alcoholics Anonymous and decided to give up his job as a NYS Assemblyman. He knew it was time for change and he was on a road of recovery, family and God." (See letter from Robert McLaughlin, Ex. 28.)

Robert feels that his father "has showed [sic] in the past 3 years the real person he is." Robert is very proud that his "father never turned to drink in all of this when everything first happened and he lost his job as President of the NYC Central Labor Council." *Id.* Rather Robert believes his father was "humbled and swallowed his pride and ego and went back to work as a local 3 electrician." *Id.* He adds that his father "also drove a yellow cab, limo and started to work as a sandhog" in an effort "to provide whatever he possibly [could] for his family." *Id.* Brian McLaughlin writes that his father is a "great father, a best friend, and a powerful example in regards to his sobriety, help of others and hard work to support his family." (See letter from Brian P. McLaughlin, Ex. 24.) He describes that throughout the seven weeks his father received

- 14 -

"radiation treatment for a recurrence of prostate cancer. . . he never missed a day of work as a sandhog and continued his work in Alcoholics Anonymous and other commitments." *Id.*

His daughter Kelly writes that since her father's indictment, she "has watched [her] father transform" his life." (See letter from Kelly McLaughlin, Ex. 27.)  She believes that "[b]y reflecting on his past with the help of his family, counseling and religion [her father] has become a new man." *Id* She now speaks to him on a "daily basis" and "spends quality time" with him often.  Kelly writes that, [w]hereas it was difficult to slow him down in the past, he is now always available for [her] and [her] siblings ..." *Id.*  She describes him as someone who was once a great "talker" who has become a great "listener" and giver of advice.  In recent years Kelly's relationship with her father has strengthened because they have been able to enjoy time together, "go[ing] to the beach, picnic[king] in the park, or simply watch[ing] a movie together." *Id.*

All his adult children ask that Your Honor consider Mr. McLaughlin's relationship with his nine-year-old daughter, Meaghan.  His son, Robert, writes that his father's relationship with Meaghan "just makes [him] smile and be joyful." (See letter from Robert McLaughlin, Ex. 28.) Kelly McLaughlin notes that her nine year old sister, Meaghan, has "benefited most from having [Mr. McLaughlin] around more these past few years." (See letter from Kelly McLaughlin, Ex. 27.)  She feels that her "father has been given a second chance to make the best of being a full time father and has taken advantage of every minute of it." *Id*  Mr. McLaughlin's son, Robert, also writes his father and Meaghan have a close relationship. (See letter from Robert McLaughlin, Ex. 28).  She spends every weekend with her father who takes "her to church every week, soccer, ice skating" as well as helping her with her homework.  His daughter Cassie writes that Meaghan has benefited "from his total time and commitment to her in ways too numerous to list." (See letter from Cassie McLaughlin, Ex. 25.)

- 15 -

Mr. McLaughlin's wife, Eva, writes that she and Mr. McLaughlin have been living apart since March 2008 "[a]s a result of existing problems in [their] marriage and the high profile focus on aspects of our marriage by the media." (See letter from Eva McLaughlin, Ex. 26.) Despite their current marital woes, Mrs. McLaughlin sees her husband as a changed man who is a "much more balanced man, father and worker." *Id.* She writes that he "has openly admitted criminal activity and has shown deep remorse for the pain that he has caused others." *Id.* She notes that "more importantly, it is clear that he is not the same person that was driven by blind ambition that led to many of these problems." While he was "driven by ambition and power for over 30 years in the labor and political circles. For over three years he is no longer anything like that." *Id.*

Mrs. McLaughlin describes Mr. McLaughlin as "an incredible and loving father" who was "[o]nce a seven day a week suit and tie workaholic who popped in and our [sic, out?] of the family[,] he today is a seven day a week devoted father with a relationship with each of his children and an incredible bond exists between him and [their] youngest." *Id.* Mrs. McLaughlin writes that her husband has provided for the "family and the children by working hard as an electrician, taxi driver and instructor, and as a hard working sand hog in the Bronx." *Id.* She concludes by communicating her hope that "these positive changes in his life bring out compassion in his sentencing and give a confidence of what kind of contributor he will continue to make for his family and the community..." *Id.* Stephen McLaughlin writes that when he looks at his brother, he "see[s] a man who has changed because he wanted to. He has maintained this new improved way of life since his ordeal began. Despite his conviction, in many ways he seems happier. Brian has lost everything, his house, money, and his stature in the business world as well as in his community. He has paid a price. There is no chance of Brian being a recidivist,

- 16 -

he posses no threat to society and has much to offer." (See letter from Stephen McLaughlin, Ex. 29.) In conclusion his brother asks that Your Honor "show leniency for a man who has changed his life, and paid a price already."

Several of Mr. McLaughlin's friends, outside the family, point out that he has "reconciled his sins and has for the last few years devoted himself to raising his youngest daughter Meaghan and being a father to his four other children whom [sic] are all adults." (See letter from Donald Pirone Jr., Ex. 38.) His friend for over 25 years, George Andrucki, writes that although Mr. McLaughlin has "lost most of his material goods", he has "gain[ed] his sobriety [and] has worked hard and become a better parent," "sustaining his children in this difficult time" through "[h]is constant presence." Mr. Andrucki goes on to write that Mr. McLaughlin's "old behaviors; control, manipulation, and false ego replaced by honesty, respect and true concern." (See letter from George Andrucki, Ex. 3.)

One friend describes Mr. McLaughlin as "a good father who loves his family very much." (See letter from Thomas N. Zahn, Ex. 47.) Another describes him as a "loving father" whom "[a]ll of his children love him and turn to [] when they need guidance." (See Letter from Christina Conaty, Ex. 12.) While his children were growing up, they remember Mr. McLaughlin as a devoted family man who attended "every dance competition, every award dinner, and never missed a beat when it came to Meaghan, his youngest." (See letter from Donald P. Pirone Jr., Ex. 38.) One person asks that Your Honor consider Mr. McLaughlin's children "who really need his strength and support." (See letter from Jenna Sisti, Ex. 43.) Mr. McLaughlin's former pastor writes that he believes "Mr. McLaughlin can be a great asset to the community and certainly to his family, and in particular, to his youngest daughter, Meaghan." (See letter from Msgr. Brian J.

DM_US:22115615_1

McNamara, Ex. 31.)  One friend writes that his greatest concern is Mr. McLaughlin's "little girl", writing that "[t]hey are inseparable" and that "Brian is her whole world."

We realize that ties to family or the needs of a particular family member are not factors that are favored in the Guidelines.  But family ties can be helpful in determining a defendant's sincerity and whether his acceptance of responsibility and resolve to change are genuine.

### Conclusion

Mr. McLaughlin is at heart and core a good man  who lost his way but has found it again. He takes responsibility for the mistakes he has made and for the changes he must make to once again be a contributing member of society.  Mr. McLaughlin's commitment to sobriety and his renewed dedication to his family demonstrate his return to a proper path in life.  We respectfully ask the Court to show him leniency.

Dated:  New York, New York
        May 5, 2009

Respectfully submitted,
HOWREY LLP

By: /s/ Amory W. Donelly
    153 East 53rd Street
    54th Floor
    New York, NY 10022
    (212) 896-6500


Michael F. Armstrong, Esq.
LANKLER & CARRAGHER LLP
845 Third Avenue, 17th Floor
New York, NY 10002
(212) 812-8910


*Attorneys for the Defendant*

DM_US:22115615_1

## CERTIFICATE OF SERVICE

I certify that on May 5, 2009, Sentencing Memorandum on Behalf of Brian M. McLaughlin in Aid of Sentencing, dated May 5, 2009, were served by hand upon Kisha Singleton, U.S. Probation Officer, at Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, and upon Daniel Braun, Esq., at U.S. Attorney's Office, One St. Andrew's Plaza, 8th Floor, New York, NY 10007.

Dated: New York, New York
      May 5, 2009

                                    Amory W. Donelly