UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

BRIAN M. McLAUGHLIN,

Defendant.

No. 06 Cr. 965 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

The Clerk of the Court is instructed to docket the attached letter.

SO ORDERED.

Dated: December 18, 2009
New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 18, 2009

FOR DELIVERY TO CHAMBERS - REDACTED

The Honorable Richard J. Sullivan
United States District Judge
United States Courthouse
500 Pearl Street, Chambers 615
New York, New York

**Re: United States v. Brian M. McLaughlin, 06 Cr. 965 (RJS)**

Dear Judge Sullivan:

The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Brian M. McLaughlin has rendered in the investigation and prosecution of other persons. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.[1]

**Background: The "City Lights" Investigation**

Prior to 2000, the Federal Bureau of Investigation ("FBI") – working with assistance from U.S. Department of Labor's Office of Labor Racketeering and Fraud Investigations ("DOL"), the New York

[1] The Government is not moving for a downward departure from the applicable Guidelines range at this time, and instead intends to make such a motion at sentencing, solely as a result of the Second Circuit's decision in United States v. Padilla, 186 F.3d 136, 142 (2d Cir. 1999), which precludes the Government, under the terms of a cooperation agreement such as the one between the Government and the defendant in this case, from withdrawing a Section 5K1.1 motion once it has been filed.

City Department of Investigation ("DOI"), and this Office – commenced a criminal investigation focusing on allegations of public corruption, labor racketeering, and bid rigging for contracts in the New York City street-lighting industry. Law enforcement agencies have referred to this long-term investigation as the "City Lights" case.

The City Lights case focused principally on the activities of Brian McLaughlin, as well as individuals and entities connected to McLaughlin. Prior to 2006 – when the investigation became known to the public, and when McLaughlin was indicted – McLaughlin was a New York State Assemblyman who represented a district located in Queens. He was also the President of the New York City Central Labor Council, which functions as the AFL-CIO's regional office for New York City. Finally, McLaughlin served as a Business Representative for Local 3 of the International Brotherhood of Electrical Workers (the "IBEW"); in that capacity, McLaughlin's principal responsibility was to oversee the affairs of the Local's "J Division." Members of the J Division have typically worked for large electrical contracting companies that, among other things, have maintained traffic signals and street lights throughout New York City, under the terms of multi-million-dollar contracts that have been administered by the City's Department of Transportation.

Because of the official positions that McLaughlin held, he was a prominent and influential political figure and labor leader, and he was responsible for representing the interests of many people. Rather than meeting those obligations honestly, however, McLaughlin misused his official positions to further his own personal interests. In doing so, he betrayed the people he was supposed to protect; he undermined the important causes that he had worked to advance; and he played a significant role in corrupting an industry that provides an important service to the City of New York.

**McLaughlin's Offense Conduct**

Over the course of its investigation, the Government obtained evidence demonstrating that McLaughlin was using his various official positions – in the State Assembly, the Central Labor Council, and Local 3 – to carry out a wide variety of inter-related criminal schemes. In order to commit and conceal this unlawful conduct, McLaughlin received assistance from a group of closely connected associates, whom McLaughlin had appointed to serve in official or supervisory positions within labor-related and political organizations that McLaughlin

oversaw. Contractors employing J Division members also participated in some of the criminal conduct that the investigation revealed.

The Indictment filed in this case – and, in a more summary fashion, the Presentence Investigation Report ("PSR") – describes much of McLaughlin's criminal conduct. A number of the schemes that McLaughlin and his associates committed involved fraud and embezzlement from entities over which McLaughlin exercised control. For example, McLaughlin misappropriated substantial amounts of money from: (1) an account that functioned as the J Division's treasury, which was referred to as the "Street Lighting Association" ("SLA"); (2) an organization called the Electchester Athletic Association (or "EAA"), which financed and operated youth sports programs – mainly, a little league – in an area of Queens where Local 3 is based; (3) McLaughlin's political campaign committee; (4) the New York City Central Labor Council; (5) the New York State Assembly; and (6) a Democratic Party political club.

McLaughlin and his associates also engaged in a number of criminal schemes involving electrical contractors that employed J Division members, as well as companies in related fields of the electrical industry. For example, McLaughlin obtained well over $1 million dollars in bribery payments, along with other property and benefits, from various employers. The Indictment describes some, but not all, of this conduct.

As McLaughlin has acknowledged during proffer sessions with the Government, his receipt of unlawful payments from contractors began in the mid-1990s, shortly after McLaughlin was elected to the State Assembly, when he began to accept cash payments from Santo Petrocelli, Sr. ("Petrocelli"). Petrocelli (who is referred to in the Indictment as the "principal owner of Company 2," or "C2-O") ran Petrocelli Electric Company, Inc., an electrical contracting company that has employed J Division members.[2] Based in significant part on detailed information that McLaughlin provided regarding his corrupt relationship with Petrocelli, the Government has determined that between the mid-1990s and 2006, when the City Lights investigation became known

---

[2] After the overt phase of the City Lights Investigation began, Petrocelli stepped down from his position at Petrocelli Electric and was succeeded by his son, Santo Petrocelli, Jr. As discussed further below, Petrocelli (Sr.) was recently indicted and charged with violating the Taft-Hartley Act by providing payments and other things of value to McLaughlin.

to the public, Petrocelli provided McLaughlin with cash payments totaling hundreds of thousands of dollars; in return, McLaughlin provided Petrocelli with various forms of assistance, using both his union office and his political connections. McLaughlin also has acknowledged that he received cars and other things of value from Petrocelli.

McLaughlin's criminal conduct involving Petrocelli was significant in its duration, in its scale, and in the manner in which it negatively influenced him to engage in additional corrupt activity; other employers in the street lighting industry, however, also made illegal payments to McLaughlin. The allegations in the Indictment describe some of that conduct. Moreover, McLaughlin acknowledged during his proffer sessions that he accepted significant monetary payments from an electrical contractor who is not referred to in the Indictment.

McLaughlin engaged in other offenses, as well. For example, the Government learned that J Division foremen were required to provide McLaughlin with a share of the proceeds that they had obtained from selling scrap metal recovered from job sites. During the investigation, those foremen informed the Government that they continued to make such payments – even when their proceeds from scrap sales were not sufficient to generate the amounts that McLaughlin was expecting – because of their fear that if they failed to do so, their livelihoods would be adversely affected. In addition, McLaughlin used the J Division membership as his personal workforce; on a regular basis, union members were called upon to perform an endless variety of chores for McLaughlin during working hours when they were being paid by contractors. McLaughlin and another J Division official also maintained a secret financial interest in a company that did business with various J Division contractors, and they used their power and influence as union officials to promote that company's, and thus their own, financial interests while undermining the integrity of bidding processes that the City implemented in an effort to ensure that public projects would be performed at the lowest possible cost. Finally, McLaughlin referred J Division members who had suffered injuries while performing their work to an attorney, so that the attorney could pursue legal claims on behalf of those workers; in return for those referrals, and in keeping with an agreement between McLaughlin and this attorney, McLaughlin received kickbacks totaling approximately $40,000.

In October of 2006, based on the evidence of this criminal conduct, McLaughlin was charged in a 44-count, 186-page indictment with (1) violations of the RICO Act, (2) mail fraud,

(3) wire fraud, (4) embezzlement of union funds, (5) money laundering, (6) violations of the Taft-Hartley Act, (7) receiving bribes, (8) conspiring to commit various federal offenses, (9) bank fraud, and (10) making false statements in connection with a loan application. In March of 2008, in accordance with a plea agreement, McLaughlin pled guilty before Your Honor to two counts of the Indictment, including the substantive RICO charge; in pleading guilty to that offense, McLaughlin specifically admitted that he had committed 21 of the predicate racketeering acts alleged in the Indictment. Through that allocution, McLaughlin, in substance, admitted to the full scope of the criminal conduct with which he was charged. In addition, in a Cooperation Agreement that McLaughlin subsequently entered into with the Government, he agreed that in addition to the crimes he admitted during his guilty plea, he would be held accountable, at sentencing, for all of the additional offense conduct (including relevant conduct) that he committed, and that he acknowledged during his proffers sessions with the Government.

**McLaughlin's Cooperation**

Law enforcement agents first approached McLaughlin in early March of 2006, just before the City Lights Investigation became widely known to the public as a result of publicity surrounding the Government's execution of a series of search warrants at various locations, including the offices of the Central Labor Council, McLaughlin's legislative district office in Queens, and Petrocelli Electric. During the agents' first conversation with McLaughlin, they expressed the Government's interest in speaking with him to explore the possibility that he could provide assistance in other investigations; they also encouraged McLaughlin to speak with legal counsel, but informed him that he would need to make a decision before the following day, when the Government was prepared to take action that would expose the investigation and that would therefore, in all likelihood, limit McLaughlin's ability to cooperate. McLaughlin consulted with counsel over the course of that evening, and into the early hours of the following day. At that time, McLaughlin's counsel – who has not represented him since the summer of 2006, when he was replaced with McLaughlin's current attorney, Michael F. Armstrong – contacted the Government and advised us that, for the time being, McLaughlin was not willing to speak with the Government.

Over the next several months, after conducting court-authorized searches, the Government approached and interviewed numerous individuals and obtained documents and other evidence from various sources in furtherance of its investigation.

Moreover, several witnesses who were closely connected to McLaughlin, and who had information that was relevant to his criminal conduct, testified before the grand jury.

In August of 2006, between five and six months after the overt phase of the investigation had commenced, Mr. Armstrong contacted the Government on McLaughlin's behalf. During that conversation, beyond indicating that he had recently been retained as McLaughlin's attorney, Mr. Armstrong indicated that McLaughlin had come to terms with his criminal conduct and was prepared (1) to meet with the Government, (2) to admit his wrongdoing fully, and (3) to explore any opportunity to cooperate with law enforcement. At the time, the Government was nearing the completion of its efforts to prepare and present an indictment charging McLaughlin, and believed that it would not be productive to meet with McLaughlin prior to the filing of charges that could form the basis for future conversations. In addition, in light of the widespread publicity surrounding the investigation, the Government did not perceive any likely opportunity to pursue covert investigative measures based on information that McLaughlin might provide. Accordingly, the Government asked Mr. Armstrong whether McLaughlin had any time-sensitive information regarding significant and ongoing criminal conduct that the Government could investigate proactively; in response, Mr. Armstrong advised that to his knowledge, McLaughlin did not possess that type of information. Accordingly, the Government declined to meet with McLaughlin prior to the filing of the Indictment, but made clear that it would be willing to engage in such discussions if and when an indictment was returned. Mr. Armstrong reiterated that McLaughlin was prepared to meet with the Government, to admit his criminal conduct, and to provide truthful answers to any questions the Government posed whenever the Government agreed to meet with him.

Mr. Armstrong promptly reiterated McLaughlin's willingness to meet with the Government after the Indictment was filed. The Government then interviewed McLaughlin during a series of proffer sessions. During those meetings – which covered a wide range of subjects, including but not limited to the allegations in the Indictment – McLaughlin candidly admitted the full scope of his criminal conduct. Moreover, he provided detailed information regarding his misconduct that was not previously known to the Government. McLaughlin was consistently forthright and remorseful during these discussions, and he did not withhold information regarding the nature or extent of his misconduct. The Government recognizes, of course, that McLaughlin pursued this effort to cooperate in the hope of ultimately obtaining a

more lenient sentence; it has also been our impression, however, that McLaughlin's cooperation reflects a genuine acceptance of responsibility for his criminal conduct.

The information that McLaughlin has shared with the Government, and the cooperation that he has provided

has advanced several criminal investigations in important ways. It has also helped enable the Government to commence two criminal cases that are now pending. This substantial assistance is described in greater detail below.

REDACTED

A. The Investigation Of Anthony Seminerio

McLaughlin has provided substantial assistance in the investigation and prosecution of Assemblyman Anthony Seminerio. Seminerio has served as a New York State Assemblyman in the New York State Legislature representing a district in Queens, New York, for approximately 30 years. As a result of McLaughlin's cooperation, Seminerio has been charged in indictment S1 08 Cr. 1238 (NRB) with engaging in a scheme to defraud the public of his honest services as a member of the Assembly by using an alleged consulting firm, named Marc Consultants, to solicit and receive over $1 million in "consulting" payments from persons and entities having business before the State of New York. In reality, Seminerio did little or no consulting work. Rather, Seminerio was retained as a "consultant" in connection with his position as a member of the Assembly and with the expectation that through the performance of his official duties, he could obtain favorable treatment for his "clients" in New York State Government.

During its investigation of McLaughlin, the Government obtained a recording of a conversation in which McLaughlin and Seminerio discussed issues regarding expenditures of campaign funds. Partly as a result of that recording – and in light of other evidence, as well – the Government questioned McLaughlin regarding Seminerio during proffer sessions. McLaughlin and Seminerio had known each other for approximately 15 years and had served together in the New York State Assembly. When the subject of Seminerio arose during his meetings with the Government, McLaughlin related, in part, his impression that Seminerio, through a consulting business that he had formed, appeared to be using his State Assembly office as a kind of private business. As McLaughlin further explained, although he had no direct involvement in or firsthand knowledge of Seminerio's consulting activities, it appeared to him that Seminerio was receiving

consulting payments for the type of work that an Assemblyman would normally undertake in carrying out his responsibilities as an elected official. This observation, along with other information the Government had obtained relating to Seminerio, led the Government to investigate Seminerio further.

As a result of his relationship with Seminerio, McLaughlin was able to assist the investigation in two critical ways. First, in or about the fall of 2007, McLaughlin met with Seminerio repeatedly under the guise of seeking advice on establishing his own consulting company. During those meetings, McLaughlin wore a recording device and taped Seminerio discussing the origins and details of the fraudulent scheme that forms the basis of the pending case in which he is charged.

Second, McLaughlin introduced an undercover FBI agent (the "UC") to Seminerio in a January 18, 2008 meeting, claiming that the UC was a venture capitalist who was interested in privatizing certain components of New York's probation services. As a result of this introduction, the UC successfully became one of Seminerio's clients, after which time Seminerio began taking official acts on the UC's behalf.

Relying in part on the recordings made by McLaughlin, and the relationship established by McLaughlin between the UC and Seminerio, the Government applied for and received authorization to undertake a series of investigative steps, including: (1) the interception of electronic communications on Seminerio's cellular telephone as well as telephones at his legislative office beginning in or about November 2007 and continuing through in or about August 2008; (2) the interception of oral communications at his legislative office during that time period; and (3) search warrants for Seminerio's home, as well as his legislative offices in Albany and Queens, New York, in or about September 2008.

On September 10, 2008, the Government unsealed a criminal complaint charging Seminerio with honest services mail fraud. The complaint relied in part on McLaughlin's information. Although the complaint only referred to him as "a cooperating witness" or "CW," press reports quickly identified McLaughlin as the source of the information.

Seminerio's case is currently scheduled for trial starting on October 27, 2009. Although McLaughlin may be called as a witness at that trial, the Government has not made any decision to do so and believes that its case against Seminerio can be presented without McLaughlin's testimony.

In addition, the investigation that has resulted in the pending charges against Seminerio is continuing. Subjects of that investigation include individuals and entities that retained Seminerio as a "consultant" in connection with efforts to obtain favorable treatment in the New York State legislature.

B. <u>The Investigation Of Santo Petrocelli, Sr. And Others At Petrocelli Electric</u>

As stated above, McLaughlin has maintained a corrupt relationship with Santo Petrocelli, Sr. since approximately the mid-1990s, when Petrocelli began making illegal payments to McLaughlin. That relationship continued until the overt phase of the City Lights investigation commenced. During his proffer sessions, McLaughlin provided a detailed account of the history and nature of his dealings with Petrocelli; he also provided information regarding other individuals at Petrocelli Electric who had been involved in, or who would have knowledge of, that criminal conduct.

**REDACTED**

In the fall of 2007, McLaughlin met with Petrocelli and attempted to record a conversation in which Petrocelli would expressly acknowledge the corrupt nature of their prior relationship. Not surprisingly – in light of Petrocelli's background and experience, his cause for concern that McLaughlin was cooperating with law enforcement, and his representation by experienced defense counsel – this effort was unsuccessful, at least for the most part, in spite of McLaughlin's best efforts.

Nonetheless, in April of 2009, largely as a result of the information McLaughlin had provided and had helped the Government to obtain – and based on other sources of information, as well – the Government obtained an indictment charging Petrocelli with one count of making unlawful payments to a labor official (McLaughlin), and one count of conspiring to do the same. <u>See</u>

United States v. Santo Petrocelli, Sr., 09 Cr. 316 (MGC). That case is currently pending. If Petrocelli elects to go to trial, McLaughlin is likely to be an important witness for the Government. The case against Petrocelli is a significant one, in the Government's view, not only because of the nature and extent of the criminal conduct involving McLaughlin, but also, among other reasons, because Petrocelli Electric has performed major contracts for government agencies and other public authorities, and has been involved in significant construction projects in New York, New Jersey, and other areas.

**REDACTED**

The Hon. Richard J. Sullivan
May 18, 2009
page 11

**REDACTED**

**REDACTED**

Beyond the assistance described above, McLaughlin has devoted substantial amounts of time over the past several years to providing federal and local law enforcement agents with information that is relevant to ongoing criminal investigations focusing on significant allegations of corruption at all levels of government and also within trade unions and sectors of the New York City construction industry. At this time, there is no way to predict whether any of these investigations will result in the filing of criminal charges. McLaughlin's information, however, has enabled agents to gain better understandings of the manner in which political institutions, industries, and labor unions operate. It has also been instrumental in helping agents to identify, and to understand the networks of relationships between, various individuals and entities involved in the transactions that agents are exploring. With the benefit of McLaughlin's experience and insights, his knowledge of the relevant players, and his overall understanding of the landscapes in which the activities under investigation have taken place, agents have been able to formulate and follow leads and to recognize connections between pieces of information. Those building blocks can form the foundation for long-term investigations that produce significant results. And such efforts often depend, especially at the outset, on the type of background information that McLaughlin has provided based on his extensive experience in politics and organized labor.

As stated above, McLaughlin has not been called upon to testify at a hearing or a trial, and we cannot predict whether he

---

[3] For this reason, and based on all of the circumstances presented, the Government respectfully requests that the Court allow for such a voluntary surrender date.

will be asked to do so. Based on the record of McLaughlin's cooperation, however – including his forthright acknowledgment of the criminal conduct in which he was involved, as well as the other corroborating evidence that he helped the Government to obtain – we are confident that if he is called as a witness, McLaughlin will work diligently to prepare and will provide truthful testimony.[4]

For all of these reasons, the Government has determined that Brian McLaughlin has provided substantial assistance in the investigation and prosecution of other individuals. That assistance has helped the Government to uncover and prosecute serious criminal conduct, some of which has involved violations of the public trust. The results of the City Lights investigation have also been enlisted in support of efforts to enact meaningful reforms within New York State Government and labor organizations. Finally, the City Lights investigation remains active and productive, and the Government anticipates that from the foundation of evidence that McLaughlin has helped to provide, the investigation will continue to produce significant criminal cases addressing public corruption and other forms of illegal activity.

REDACTED

**Request For Continued Confidentiality**
**Of The Matters Discussed In This Letter**

Because this letter contains confidential information the Government respectfully requests that the letter remain under seal

REDACTED

The Government recognizes that under the First Amendment, the public has a right of access to judicial proceedings, including sentencing. See United States v. Alcantara, 396 F.3d 189, 198 (2d Cir. 2005). It is well-established, however, that

---

[4] At the same time, we recognize that in light of the extent and nature of McLaughlin's criminal conduct, along with the compelling evidence of that conduct that the Government would produce in advance of his testimony, McLaughlin's credibility as a witness would be subject to vigorous attack, notwithstanding the truthfulness of the anticipated testimony that he would give.

the Government's interest in preserving the confidentiality of ongoing criminal investigations may overcome that right. See, e.g., United States v. Doe, 63 F.3d 121, 127 (2d Cir. 1995) (quoting Waller v. Georgia, 467 U.S. 39, 45 (1984)) (stating that the public's right of access to criminal proceedings "is not absolute," and "'may give way in certain cases to other rights or interests, such as . . . the government's interest in inhibiting disclosure of sensitive information.'"); United States v. Cojab, 996 F.2d 1404, 1408 (2d Cir. 1993) (sealing appropriate to avoid jeopardizing ongoing government investigations); In re Herald, 734 F.2d 93, 100 (2d Cir. 1984) (holding that the closure of a suppression hearing was appropriate where required to prevent "danger to persons, property, or the integrity of significant activities entitled to confidentiality"). The privacy interests of individuals investigated, but not indicted by a grand jury, must also be considered in weighing the First Amendment right of access. Doe, 63 F.3d at 127 (citing United States v. Haller, 837 F.2d 84, 88 (2d Cir. 1988)).

Similarly, the common-law right of access to judicial documents is not absolute. Nixon v. Warner Communications, 435 U.S. 589, 602 (1978). The Second Circuit has held that the common-law right of access to judicial documents may be overcome by the law enforcement privilege. United States v. Amodeo, 44 F.3d 141, 145-47 (2d Cir. 1995). The purpose of that privilege is:

> to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

Amodeo, 44 F.3d at 147 (quoting In re Dep't of Investigation, 856 F.2d 481, 484 (2d Cir. 1988)).

Accordingly, the First Amendment and common-law rights of access must be balanced against the Government's interest in preserving the confidentiality of ongoing investigations. See, e.g., United States v. Milken, 780 F. Supp. 123, 126 (S.D.N.Y. 1991) 780 F. Supp. at 126 (recognizing "that protecting the secrecy of ongoing criminal investigations is a 'higher value' justifying some limitation of public access to criminal proceedings")(citing United States v. Haller, 837 F.2d at 88). In this case, the Government submits, when these interests are

weighed, the balance tips strongly in favor of the Government's request that this letter remain sealed for the time being.

Mr. Armstrong has also expressed strong concerns to the Government that if this letter is disclosed to the public, there is likely to be increased publicity regarding McLaughlin's cooperation, and that such publicity will create heightened risks for McLaughlin's safety, especially during any period in which he is incarcerated. While the Government is not aware of any specific threat to McLaughlin's safety, we cannot and do not dismiss such concerns and ask Your Honor to take them into account in rendering a decision regarding the confidentiality of this submission.

**Conclusion**

As a result of the foregoing (and subject to the conditions set forth in the opening paragraph above), the Government has determined that Brian McLaughlin has provided substantial assistance in the investigation and prosecution of other persons. The Government therefore expects to request at sentencing that the Court sentence McLaughlin in light of the relevant facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines.

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney

By: ______________________________
Daniel A. Braun
Assistant United States Attorney
(212)637-2215

cc: Michael F. Armstrong, Esq.